# Illinois Official Reports

## Appellate Court

---

### *In re S.P.*, 2019 IL App (3d) 180476

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Daemontae P., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-18-0476 |
| Filed | January 4, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 14-JA-137; the Hon. Paula A. Gomora, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel Kallan, of Joliet, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Lytton and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1 The respondent, Daemontae P., appeals from the circuit court's order terminating his parental rights to his minor daughter, S.P. On appeal, the respondent argues that (1) his right to due process was violated during the termination proceedings because the trial court lacked personal jurisdiction, erred in allowing his attorney to withdraw, and failed to admonish him of his right to appeal after entry of the dispositional order; (2) the trial court's finding that respondent was an unfit parent was against the manifest weight of the evidence; and (3) the trial court's finding that it was in the minor's best interest to terminate his parental rights was against the manifest weight of the evidence. We affirm.

¶ 2                                      FACTS

¶ 3 In 2009, S.P. was born. At the time of S.P.'s birth, S.P.'s mother was 19 years old, and her father, the respondent, was 15 years old. Respondent and S.P.'s mother were not married. Respondent was listed as the father of S.P. on S.P.'s birth certificate.

¶ 4 Five years later, on September 24, 2014, a neglect petition was filed by the State in regard to S.P., alleging that S.P. was dependent due to the physical or mental disability of "her parent." The petition was filed after S.P.'s mother was hospitalized and had no one to care for S.P. The same day that the petition was filed, on September 24, 2014, a shelter care hearing took place. S.P.'s father, the respondent, was present at the shelter care hearing, and he was appointed counsel. The State requested that intact family services be ordered. In light of the State's request, the trial court ordered that the Department of Children and Family Services (DCFS) provide intact family services and ordered S.P.'s mother and respondent to "fully comply with all DCFS intact services."

¶ 5 On October 27, 2014, a status hearing on intact family services took place. Respondent was not present in court but his attorney appeared. S.P.'s mother had been cooperative, and the case was continued for 90 days for another status hearing. On January 6, 2015, respondent again was not present in court, but his attorney appeared. Although the matter had originally been scheduled for a status hearing on intact family services, the State requested a shelter care hearing based on a stipulation by S.P.'s mother that S.P. was neglected and an immediate and urgent necessity existed for her protection as the result of S.P.'s mother having made an apparent suicide attempt and there being domestic violence between S.P.'s mother and respondent. The attorney for respondent indicated that she had "no position" because she had not had any contact with respondent since the day of her appointment on September 24, 2014. Based on the stipulation of S.P.'s mother, the trial court ordered that S.P. be placed in the temporary custody of DCFS. The case was continued until March 9, 2015, for an adjudication hearing and then continued again after respondent did not appear due to having been incarcerated.

¶ 6 On April 2, 2015, an adjudication hearing took place. Both S.P.'s mother and respondent appeared in court with their attorneys and stipulated to S.P.'s mother's apparent suicide attempt while caring for S.P. and the respondent being unable to care for S.P. due to him being incarcerated. The trial court admonished S.P.'s mother and respondent that they must comply with the terms of the service plan that would be implemented by DCFS. Respondent's attorney requested that "someone go see [respondent] at the jail" to make sure he receives a copy of the service plan. The written adjudication order indicated that both S.P.'s mother and respondent

had admitted to the allegations in the neglect petition and S.P. was found to be neglected. The factual basis for the trial court's finding was that S.P.'s mother had an apparent suicide attempt, respondent was currently incarcerated, and intact family services had failed.

¶ 7 On May 18, 2015, S.P.'s mother and respondent appeared in court with their attorneys. The guardian *ad litem* indicated that the case was to be closed upon S.P.'s mother completing a drug drop. S.P.'s mother tested positive for cannabis, and the parties agreed to continue the matter for a dispositional hearing.

¶ 8 On June 25, 2015, at the dispositional hearing, both S.P.'s mother and respondent appeared in court with their attorneys. S.P.'s mother had again tested positive for the use of marijuana. The State requested that the trial court make S.P. a ward of the court due to respondent's inability to care for S.P. as the result of his incarceration and the failure of S.P.'s mother to complete services and her failing drug tests the past two court dates. The State indicated that whatever the court found in regard to the ability of respondent to care for S.P. was "fine with the State," noting there were not many services available in the Department of Corrections. Respondent's attorney indicated that respondent did not want his child to become a ward of the court and requested that, if the court made a S.P. a ward of the court, respondent be found "unable" to care for her with a goal of returning her home. The trial court found that it was in the best interest of S.P. that she be made a ward of the court on the basis of respondent being incarcerated and S.P.'s mother failing to complete mental health or substance abuse services and testing positive for marijuana use. The trial court found that S.P.'s mother was unfit to care for S.P. and respondent was unable to do so because he was incarcerated. The permanency goal for S.P. was to return home within 12 months. The trial court admonished S.P.'s mother and respondent to comply with the terms of the service plan that had been implemented by DCFS or risk termination of their parental rights. Respondent indicated that he "absolutely" understood. Respondent's attorney requested that respondent be provided with a copy of his service plan because he had not yet received one.

¶ 9 On August 25, 2015, a permanency review hearing took place. Respondent was not present because he was in prison, but his counsel appeared in court on his behalf. The failure of S.P.'s mother to comply to with her service plan was discussed. The trial court found that S.P.'s mother and respondent did not make reasonable progress and continued the case until October 13, 2015, for a status on the psychological evaluation of S.P.'s mother, and until February 23, 2016, for a permanency review hearing. The trial court indicated that the October status date was just in regard to the mother and respondent should be brought in for the permanency review hearing on February 23, 2016.

¶ 10 On February 23, 2016, a permanency review hearing took place, and respondent appeared with his attorney. The respondent's attorney indicated that respondent indicated that he had not yet received a service plan, but she indicated that respondent would be receiving a copy of the service plan that day. Respondent's attorney also indicated that respondent was participating in anger management and drug programs in the Department of Corrections and was trying to find a parenting program. The trial court told respondent that it was okay if he did not appear in court so as not to disrupt his attendance in programming available in the Department of Corrections, as long as he adequately communicated with his attorney. The trial court admonished respondent that if he chose not to appear at the next court date, he should be sure not to lose his attorney's phone number so that he would know when the following court date was scheduled. The trial court asked if the respondent would be able to appear in court after the

respondent's release from prison on September 4, 2016. Respondent indicated that he would. The trial court stated, "September 6 is your next court date here at 11:00."

¶ 11    On September 6, 2016, respondent did not appear in court but his attorney was present. The attorney for the State indicated that all parties were in receipt of the service plan. The case was continued until November 14, 2016, for a status on the mother's compliance with services. On November 14, 2015, respondent was not present in court but his attorney appeared on his behalf. The parties discussed the mother's visitation schedule with S.P. and S.P.'s two half siblings (not respondent's children) and the mother's upcoming cesarean section for the birth of her fourth child (not respondent's child). The case was continued until February 8, 2017, for a permanency review hearing.

¶ 12    On February 8, 2017, respondent did not appear in court. Respondent's attorney requested that she be allowed to withdraw from representing respondent because respondent had not appeared in court since February 23, 2016, and she had not had any contact with him since that date. The trial court granted respondent's attorney request for leave to withdraw from representing respondent. The trial court found that neither S.P.'s mother nor respondent had made reasonable progress. The case was continued until May 3, 2017, for a status on an assessment of the parenting capacity of S.P.'s mother. Thereafter, the case was continued three more times because the mother's parental capacity assessment had not been completed. Neither respondent, nor an attorney on his behalf appeared at those hearings pertaining to the mother's parental capacity assessment.

¶ 13    On August 21, 2017, a permanency review hearing took place. Neither S.P.'s mother nor respondent appeared in court. The guardian *ad litem* indicated that S.P.'s mother had completely disengaged in services. The trial court ordered that the case be sent to legal screening.

¶ 14    On February 9, 2018, the State filed a petition to terminate the parental rights of S.P.'s mother and respondent. A notice of the motion to terminate parental rights was filed on February 9, 2018, certifying that the motion to terminate parental rights was served via the United States Postal Service upon "the attorneys of record." The notice indicated that the notice and attached termination petition were mailed to the guardian *ad litem*, the attorney for S.P.'s mother, respondent's attorney who had been granted leave to withdraw, the caseworker, S.P.'s mother, and respondent.

¶ 15    The petition alleged, *inter alia*, that respondent failed to maintain a reasonable degree of interest, concern, and responsibility as to the S.P.'s welfare (750 ILCS 50/1(D)(b) (West 2016)), failed to make reasonable efforts to correct the conditions that were the basis for the removal of S.P. (*id.* § 1(D)(m)(i)), and failed to make reasonable progress toward the return of S.P. during any nine-month period after the end of the initial nine months following the adjudication of neglect, with the said time period being February 8, 2017, through November 8, 2017 (*id.* § 1(D)(m)(iii)).

¶ 16    On February 27, 2018, the caseworker informed the trial court that respondent had returned to jail. The matter was continued for status on jurisdiction and discovery. On March 27, 2018, respondent appeared in court and was reappointed the same counsel. The trial court admonished respondent to stay in touch with his attorney and to exchange contact information with her.

¶ 17    On August 6, 2018, a hearing on the petition to terminate parental rights took place. Respondent was present in court with his attorney. Evidence was presented in regard to S.P.'s

mother disengaging in services, indicating that she was going to surrender her parental rights, and ceasing to make any contact with the caseworker. As to respondent, the caseworker testified that respondent had completed a parenting program in August or September 2016, when he was incarcerated. Respondent never had a visit with S.P. that was arranged through DCFS. The caseworker testified that for the entire duration of this case, the location and phone number for DCFS had never changed. No letters, cards, gifts, or money were ever received for S.P. from respondent. The caseworker had difficulty keeping in contact with respondent. The caseworker never visited respondent while he was incarcerated and never did an individual assessment on respondent. When respondent was not incarcerated, the caseworker had no contact with him because the contact information the caseworker had for respondent was invalid. The caseworker had told respondent to contact her when he was released. Respondent had only called the caseworker one time but did not leave a phone number for her to be able to return his phone call. No third party tried to contact the caseworker on respondent's behalf. Other than when the caseworker would see respondent in court, she had no contact with him. The caseworker provided respondent with a service plan after the trial court had allowed her "to meet him in the back." The services on respondent's service plan were a parenting program, mental health assessment, and a 26-week domestic violence program. A mental health assessment and a domestic violence program were not available to defendant during his incarceration. Whether respondent was able to implement what he learned in the parenting program was unable to be determined because there had not been any visits between him and S.P. Other than leaving one voicemail message with no return phone number, respondent never requested a visit with S.P.

¶ 18 Respondent testified that he has been incarcerated for the past 19 months, since January 13, 2017. He testified that S.P. was born in 2006 (although she was born in 2009). At the time of S.P.'s birth, respondent was a juvenile in an alternative to detention program and was brought to the hospital for her birth and paternity testing. After S.P.'s birth, respondent went into the Department of Corrections when he was 18 years old, for a period of seven months, from October 2011 until April 2012. The neglect petition was filed on September 24, 2014. Respondent was incarcerated again on new charges in March 2015 and released on parole in September 2016. He was incarcerated again on January 13, 2017, and was currently still incarcerated. Other than the four months from September 2016 to January 2017, respondent had continually been incarcerated since March 2015 (prior to the adjudication hearing on April 2, 2015, and the dispositional hearing on June 25, 2015). Several people visited respondent during his incarceration over the past 19 months—his biological mother, his foster mothers, his foster brother, and "an individual [he's] acquainted with."

¶ 19 Respondent testified that during the four-month period when he was not incarcerated, he visited with S.P. a few times on Fridays when S.P.'s mother had visits with S.P. at the home of S.P.'s maternal grandmother. Respondent testified that he developed a close relationship with S.P. during that time. Respondent testified that he was limited in his movement during that four-month period, due to having to wear an ankle bracelet and only being allowed to go to and from his construction job. Respondent testified that he had asked his parole officer if he could have extended visits with S.P. He also testified that he left a message with DCFS with his address and phone number but no one returned his phone call. Respondent testified that he was never informed by DCFS that he needed a mental health assessment or domestic violence

assessment. Respondent acknowledged that he had a discussion with the caseworker in a room at the back of the courtroom.

¶ 20 After the relevant nine-month period, while incarcerated, respondent received certificates for participation in a drug recovery program on November 29, 2017, for completion of a drug recovery program on January 19, 2018, completion of a parenting workbook on April 12, 2018, and a completion of a coping with grief program on July 19, 2018. Respondent testified that he was willing to complete services in order to be reunited with S.P.

¶ 21 The trial court found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to S.P.'s welfare and that respondent failed to make reasonable progress toward the return home of S.P. during any nine-month period after the initial nine-month period following the adjudication of S.P. as being neglected, with the time period being February 8 to November 8, 2017.

¶ 22 At the best interest hearing, as to respondent, the caseworker testified that S.P. and S.P.'s younger two half sisters have been in the care of the same foster family since January 2015. The foster parents have two older adopted sons, ages 18 and 20. The boys have a bedroom in the basement and the girls share an upstairs bedroom in four-bedroom home. The foster parents would like to adopt S.P. and her two half sisters. S.P. and her two half sisters refer to the foster parents as mom and dad. The foster parents take the three girls on vacation with them and pay for them to participate in summer programs. In discussing adoption, S.P. told the caseworker that she knew that someone had to take care of her and since she was going to be adopted she wanted to stay in the home of her foster parents. Initially, S.P. struggled with the not going home to her mother and was in trauma therapy for abandonment issues. The caseworker testified that S.P. did not expressly state that she loves her foster parents but has shown love for them by her actions. As an example, the caseworker testified that S.P. will climb onto her foster mother's lap or go to her foster mother for hugs. S.P.'s daily needs were met by the foster parents and the foster parents loved her. The caseworker further testified that she had never observed a visit between respondent and S.P. and that she was not aware whether a bond existed between them. The caseworker was also not aware as to whether S.P. called respondent dad.

¶ 23 Respondent testified that he loves S.P. and was willing to complete services to reunite with her. Respondent testified that he had a bond with S.P., he had a construction job waiting for him after his release from prison, and an apartment with enough room for S.P. Respondent indicated that S.P.'s favorite color is purple and that she calls him "dad." The last time respondent saw S.P. was in 2016. Respondent's next court date related to his imprisonment was on August 10, 2018, but he was not going to be released on that date.

¶ 24 The trial court found that it was in the best interest of S.P. to terminate the parental rights of S.P.'s mother and respondent. Respondent appealed.

¶ 25 ANALYSIS

¶ 26 I. Due Process

¶ 27 On appeal, respondent argues that the order terminating his parental rights violated his right to due process because the trial court (1) lacked personal jurisdiction over him, (2) erred in allowing his attorney to withdraw, and (3) failed to admonish him of his right to appeal the dispositional order entered on June 25, 2015. Parents have a constitutional right to the custody

of their children, and the depravation of that right must comply with the requirements of procedural due process. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003); *In re Ch. W.*, 408 Ill. App. 3d 541, 550 (2011). The due process clause of the United States Constitution provides heightened protection against governmental interference with the fundamental rights of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act of 1987 (Act) (705 ILCS 450/1-1 *et seq.* (West 2016)) and fundamental fairness. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Claims of due process violations are questions of law that we review *de novo. In re A.M.*, 402 Ill. App. 3d 720, 723 (2010); *In re D.W.*, 214 Ill. 2d 289, 309 (2005).

¶ 28        In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Unites Supreme Court identified three factors to be considered when determining what due process safeguards require in proceedings that implicate fundamental liberty interests: (1) the private interest implicated by the official action; (2) the risk of an erroneous deprivation of that interest through the proceedings used, and the probable value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Andrea F.*, 208 Ill. 2d at 165 (citing *Mathews*, 424 U.S. at 335). These same *Mathews* factors have been applied to cases involving the termination of parental rights. *Id.*

¶ 29                          a. Copy of Juvenile Neglect Petition/Motion to Terminate Parental Rights

¶ 30        On appeal, respondent first argues that his right to due process was violated because the record does not affirmatively show that he was given a copy of the original neglect petition in open court. Respondent argues that the trial court did not have personal jurisdiction over him because the State failed to properly serve him with process. Respondent argues that without an affirmative showing that he was given a copy of the original juvenile neglect petition, his appearance in court did not confer upon the trial court personal jurisdiction over him. The guardian *ad litem* argues that respondent waived service by his appearance in court. The State, too, argues that respondent subjected himself to the jurisdiction of the trial court by appearing in court.

¶ 31        "Personal jurisdiction is the court's power 'to bring a person into its adjudicative process.' " *In re M.W.*, 232 Ill. 2d 408, 415 (2009) (quoting Black's Law Dictionary 870 (8th ed. 2004)). Personal jurisdiction is a matter of statutory interpretation. *Id.* at 427.

¶ 32        For juvenile petitions alleging a minor is abused, neglected, or dependent, "[p]arties respondent are entitled to notice in compliance with Sections 2-15 and 2-16" of the Act. 705 ILCS 405/1-5(3) (West 2016). "When a petition is filed, the clerk of the court shall issue a summons with a copy of the petition attached." *Id.* § 2-15(1) (West 2016). "The summons shall be directed to the minor's legal guardian or custodian and to each person named as a respondent in the petition ***." *Id.*

¶ 33        Section 2-15(7) of the Act provides:

> "The appearance of the minor's legal guardian or custodian, or a person named as a respondent in a petition, in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court, except that the filing of a motion authorized under Section 2-301 of the Code of Civil Procedure [(735

ILCS 5/2-301 (West 2008) (pertaining to objections to the court's personal jurisdiction))] does not constitute an appearance under this subsection. A copy of the summons and petition shall be provided to the person at the time of his appearance." 705 ILCS 405/2-15(7) (West 2014).

¶ 34     Here, there is no indication that summons was served upon respondent. However, on September 24, 2014, the respondent appeared at the initial hearing in this case, at which time he was appointed counsel. He also appeared at the adjudication hearing on April 2, 2015, and at the dispositional hearing on June 25, 2015. Therefore, under section 2-15(7) of the Act, even absent formal service, respondent's appearances constituted a waiver of service and constituted his submission to the trial court's personal jurisdiction, so long as he was provided with a copy of the petition. See *id.*; *In re M.W.*, 232 Ill. 2d at 428 (personal jurisdiction can be established by the party's appearance in any proceeding under the Act, "which functions as a waiver of formal service, so long as a copy of the petition is provided to the person in lieu of formal service"). Without challenging the trial court's personal jurisdiction in the trial court pursuant to section 2-301 of the Code of Civil Procedure, respondent appeared and participated in multiple proceedings under the Act and was represented by his appointed counsel at each of those hearings, resulting in a waiver of service of summons pursuant to section 2-15(7) of the Act.

¶ 35     We disagree with the respondent that due process requires that his statutorily prescribed waiver of service of service and submission to the trial court's personal jurisdiction requires was contingent upon "an affirmative showing that he was given a copy of the original petition." First, we note that the record is silent as to whether respondent received a copy of the petition. We, therefore, must presume that respondent was given a copy of the State's original neglect petition. See *In re N.B.*, 191 Ill. 2d 338, 345 (2000) (absent an affirmative showing to the contrary in the record, the trial court is presumed to know the law and apply it properly). Accordingly, we must conclude that the trial court acquired personal jurisdiction over respondent when respondent appeared at the initial shelter care hearing on September 24, 2015, and was appointed counsel.

¶ 36     Second, even in applying the *Mathews* factors, we conclude that respondent was not denied due process by the lack of an affirmative showing in the record that he received a copy of the neglect petition. The respondent's private interest at stake is his fundamental interest in the control, custody, and care of S.P. See *Andrea F.*, 208 Ill. 2d at 166 (a parent's right to the care, custody, and control of his or her child is a fundamental right). The risk that respondent was erroneously deprived of his fundamental right to the care, custody, and control of S.P. as the result of there being no affirmative showing in the record that he received a copy of the neglect petition was minimal. In this appeal the respondent makes no claim that he did not, in fact, receive a copy of the neglect petition, respondent appeared and participated in the proceedings, and respondent was represented by counsel. Additionally, although the interests of the parent are important, the State also has a fundamental interest in the proceeding to terminate parental rights, which is twofold: a *parens patriae* interest in preserving and promoting the child's welfare and a fiscal and administrative interest in reducing the cost and burden of such proceedings. *In re M.H.*, 196 Ill. 2d 356, 365 (2001). While requiring an affirmative showing in the record that respondent was provided with the neglect petition would not necessarily unduly burden the State or the court, allowing a respondent to wait through years of proceedings, until after his or her parental rights have been terminated, to take issue with the

fact that the record makes no such affirmative showing would impede upon the government's interest in preserving and promoting the child's welfare and impede upon its fiscal and administrative interest in reducing the cost and burden of such proceedings. Therefore, the application of the *Mathews* balancing test indicates that due process does not mandate an affirmative showing in the record that a respondent was provided with original juvenile neglect petition.

¶ 37    Respondent also argues that the trial court did not have personal jurisdiction over him regarding the termination proceedings because there is no proof in the record that he was given a copy of the petition to terminate his parental rights. As discussed above, personal jurisdiction was established over respondent by way of respondent appearing at the initial hearing shelter care hearing without objection. "[I]n a proceeding under the [Act], once personal jurisdiction over a parent is obtained, that jurisdiction continues until the matter is resolved." *M.W.*, 232 Ill. 2d at 428-29. Although a parent may be entitled to notice of any subsequent proceeding, the failure to give such notice does not affect the personal jurisdiction that has already been established. *Id.* at 429. Rather, failure to give notice of a proceeding is an error that may require a remedy, if the error is timely raised. *Id.*

¶ 38    Here, respondent's contention that he was not provided with a copy of the termination petition is contradicted by the record, which indicates that both he and his former attorney were mailed a copy of the petition on February 9, 2018, and that the matter was scheduled to be heard on February 27, 2018. When respondent did not appear at the hearing on February 27, 2018, the matter was continued. On March 27, 2018, respondent appeared in court and was reappointed counsel. Respondent's contention that the trial court did not have personal jurisdiction over him during the termination proceedings has no merit.

¶ 39                    b. Trial Court's Error in Discharging Respondent's Counsel

¶ 40    Respondent next argues that he was denied due process when his counsel was allowed to withdraw from representing him without filing a written motion to withdraw and without providing him with notice that she would be seeking to withdraw. Although respondent did not raise this issue before the trial court, forfeiture is a limitation on the parties and not on the reviewing court, and our concern for reaching a just result may override considerations of waiver and forfeiture. *In re Davion R.*, 2017 IL App (1st) 170426, ¶ 21. Additionally, the State concedes error but argues that the error was harmless because respondent was not prejudiced by the trial court's error where the same counsel was subsequently reappointed prior to the termination proceedings.

¶ 41    Although there is no constitutional right to counsel in proceedings under the Act, under section 1-5(1) of the Act, the parent of a minor who is the subject of proceedings has a statutory right to be represented by counsel. 705 ILCS 405/1-5(1) (West 2016). The court shall appoint counsel if the parent is financially unable to employ counsel. *Id.*; *Davion R.*, 2017 IL App (1st) 170426, ¶ 25 (citing *In re Adoption of K.L.P.*, 198 Ill. 2d 448, 461 (2002)). The statute mandates that appointed counsel appear "at all stages of the trial court proceedings, and such appointment shall continue through the permanency hearings and termination of parental rights proceedings subject to withdrawal or substitution pursuant to Supreme Court Rules or the Code of Civil Procedure." 705 ILCS 405/1-5(1) (West 2016). The statute further provides that, following the dispositional hearing, the trial court "may require appointed counsel *** to

withdraw his or her appearance upon failure of the party for whom counsel was appointed under this Section to attend any subsequent proceedings." *Id.*

¶ 42 Under Illinois Supreme Court Rule 13 (eff. July 1, 2017), an attorney must follow certain procedures before the trial court will grant his or her leave to withdraw an appearance for a party. Counsel must, among other things, submit a written motion to withdraw and provide reasonable notice of the time and place of the presentation of the motion to the represented party by personal service, certified mail, or third-party carrier, to the represented party's last known business or residence address. See Ill. S. Ct. R. 13(c) (eff. July 1, 2017). Rule 13 also requires a continuance of at least 21 days after the order granting the withdrawal for the party to retain other counsel or enter his own appearance. *Id.*; *Davion R.*, 2017 IL App (1st) 170426, ¶ 30.

¶ 43 Here, the trial court erred in allowing respondent's counsel to withdraw without requiring compliance with Rule 13. Counsel was to appear at all stages of the court proceedings but could be discharged after the dispositional hearing if respondent did not appear at any subsequent proceedings. See 705 ILCS 405/1-5(1) (West 2016). After the dispositional hearing on June 25, 2016, respondent did not attend any subsequent proceedings and his counsel was granted leave to withdraw on February 8, 2017. However, the mandate of section 1-5(1) of the Act is that a "withdrawal or substitution" comport with applicable supreme court rules, with no distinction made between counsel seeking leave to withdraw and the trial court requiring counsel to withdraw. See *id.* As the State concedes, the record contains no indication that the trial court required respondent's counsel to comply with Rule 13.

¶ 44 However, the risk that respondent was erroneously deprived of his fundamental right to the care, custody, and control of S.P. as the result of the trial court error in allowing his counsel to withdraw without compliance with Rule 13 was minimal where the record shows that respondent had appeared at the adjudication and dispositional hearings so that he was aware of the proceedings; respondent had received a service plan; respondent had been admonished to comply with the terms of the services plan or risk termination of his parental rights; respondent had failed to make himself available to the caseworker; respondent had failed to remain in contact with his attorney; during the time his counsel had withdrawn from representing him, respondent was incarcerated and there is no indication that respondent had attempted to contact counsel for assistance or advice regarding making progress toward the return home of S.P. or for any other reason at all; and during the time respondent was without counsel, the only proceedings that took place during that time were continuances for a status on the mother's progress in obtaining a parenting assessment. Thereafter, counsel was reappointed, and respondent was fully represented at the termination of parental rights hearing. Based on this record, we conclude that respondent was not denied due process as the result of the trial court allowing his counsel to withdraw without first complying with Rule 13. See *Andrea F.*, 208 Ill. 2d at 166 (finding a minimal risk that the respondent-father was erroneously deprived of parental rights as a result of the trial court's failure to admonish him that he risked termination of his parental rights if he failed to cooperate with DCFS or comply with the terms of his service plan where the record amply demonstrated that respondent was aware of the need to cooperate with DCFS and that his parental rights could be terminated).

¶ 45                     c. Failure to Admonish Respondent of Appellate Rights

¶ 46        Respondent additionally contends his due process rights were violated when the trial judge failed to advise him of his appellate rights after the entry of the dispositional order on June 25, 2015, and argues "all proceedings subsequent to June 25, 2017, including the termination of his parental rights, should be vacated and the case remanded for a redo." Respondent contends that we should review this issue for plain error, presumably because he did not raise this issue in the trial court. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005) (the plain error doctrine allows this court to consider forfeited issues when a clear or obvious error occurred and (1) the evidence is so closely balanced or (2) the error affects substantial rights). The State argues that this court does not have jurisdiction to consider this issue because respondent did not file a timely notice of appeal or late notice of appeal of the dispositional order under Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 47        In this case, the dispositional order was entered on June 25, 2015. The State is correct with regard to jurisdiction, insofar as the respondent did not file a timely notice of appeal or motion to file a late notice of appeal in regard to the adjudication or dispositional orders. See *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 65 (the dispositional order is a final and appealable order and the proper vehicle to appeal a adjudication of abuse or neglect (citing *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36)); Ill. S. Ct. R. 303 (eff. July. 1, 2017) (a notice of appeal in a civil case must be filed within 30 days after entry of the final order, unless the appellant files a motion to file a late notice of appeal within 30 days after the expiration of time to file the notice of appeal showing a reasonable excuse for failing to file a timely notice of appeal). Because the time to appeal the adjudication and dispositional orders has lapsed, we lack appellate jurisdiction to review those orders. However, in this appeal, respondent is not requesting that this court review the propriety of the adjudication or dispositional orders. Rather, respondent is requesting that this court review all proceedings subsequent to June 25, 2017—after the entry of the dispositional order—including the order terminating his parental rights. This appeal, which is from the final order terminating respondent's parental rights, was timely filed. We, therefore, have jurisdiction to review respondent's claim that the trial court's failure to admonish him of his right to appeal following the dispositional order violated his right to due process regarding any subsequent proceedings in this case.

¶ 48        Section 1-5(3) of the Act provides that upon an adjudication of wardship by the court at the dispositional hearing, "the court shall inform the parties of their right to appeal therefrom as well as from any other final judgment of the court." 705 ILCS 405/1-5(3) (West 2016). Here, the trial court erred by failing to admonish respondent of his right to appeal following the entry of the dispositional order. See *id.* However, in applying the *Mathews* factors, we do not find that respondent's due process rights were violated by this error. There was no risk that respondent was erroneously deprived of his fundamental right to the care, custody, and control of S.P. as the result the trial court's failure to admonish respondent of his right to appeal from the dispositional order where there is no indication that respondent could have raised any meritorious issue on appeal or would have even appealed at all. The record shows that at the adjudication hearing respondent made certain stipulations resulting in the trial court finding that S.P. was neglected due to an injurious environment. At the dispositional hearing, respondent was found to be unable to care for S.P. due his incarceration. Respondent makes no claim that he would have appealed either the adjudication order or the dispositional order entered in this case. Based on this record, there is no indication that respondent was denied due

process as the result of the trial court failing to admonish him of his right to appeal following the entry of the dispositional order. See *Andrea F.*, 208 Ill. 2d at 166.

¶ 49                                    II. Finding of Unfitness

¶ 50        Respondent argues that the trial court erred in finding that he failed to maintain a reasonable degree of interest, concern, and responsibility as to S.P.'s welfare and that he failed to make reasonable progress toward the return home of S.P. during the nine-month period of February 8, through November 8, 2017. Both the guardian *ad litem* and State argue the trial court's findings were proper.

¶ 51        The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship, and as such, the State must prove parental unfitness by clear and convincing evidence. 705 ILCS 405/2-29(4) (West 2016); *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The trial court's decision should not be reversed on appeal unless the finding was against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208. Only if the record shows that it is clearly apparent that the trial court should have reached the opposite conclusion should the trial court's decision be deemed to be against the manifest weight of the evidence. *Id.* In determining whether a parent has made reasonable progress toward the return home of the minor, the trial court is to consider evidence occurring only during the relevant nine-month period. *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 52        In this case, the trial court found respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress during the nine-month period of February 8, through November 8, 2017. See 750 ILCS 50/1(D)(m)(ii) (West 2016) (providing that a ground of unfitness is the parents' failure "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act"). Our supreme court has interpreted section 1(D)(m)(ii) as requiring a parent make demonstrable movement toward the goal of reunification. *C.N.*, 196 Ill. 2d at 211. The benchmark for measuring a parent's reasonable progress under section 1(D)(m)(ii) of the Adoption Act includes compliance with service plans and court directives in light of the condition that gave rise to the removal of the child and other conditions that later become known that would prevent the court from returning custody of the child to the parent. *Id.* at 216-17. Reasonable progress occurs when the trial court can conclude that the progress being made by a parent to comply with the directives given for the return of the minor is sufficiently demonstrable and of such quality that the court would be able to order the child returned to the parent's custody in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22.

¶ 53        During the applicable nine-month period, respondent was incarcerated and made no attempt to contact the caseworker. While respondent completed a parenting class in 2016 and completed a parenting workbook and drug and grief programs in late November 2017 and in 2018, there is no indication that he participated in required services under his service plan during the relevant nine-month period. Additionally, the caseworker was unable to evaluate respondent's parenting of S.P. because respondent had no visits with S.P. arranged through DCFS during the nine-month period. The record shows that respondent did not attempt to arrange any visits with S.P. through DCFS during the entirely of the proceedings. Thus, the trial court's finding that respondent failed to make reasonable progress during the applicable nine-month period was not against the manifest weight of the evidence, and the trial court did

not err in finding that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act.

¶ 54                                III. Termination of Parental Rights

¶ 55        Respondent additionally argues that termination of his parental rights was against the manifest weight of the evidence. Respondent contends that the caseworker's testimony "paint[ed] a bucolic picture of domestic harmony in the [foster family's] home" but that was "only a snap shot in time" and was "not the entire movie." Respondent argues that despite finding him unfit, the trial court could have ordered S.P. to remain in foster care while reserving the adoption issue until respondent completed his services. Respondent contends that he wants to be reunited with S.P. and that it was not in her best interest to terminate his parental rights. Respondent requests that this court reverse the trial court's termination of his parental rights or, alternatively, vacate the trial court's order granting DCFS the power to consent to adopt so that S.P. could remain in foster care while he completes substance abuse treatment.

¶ 56        Once a trial court has found that a parent is unfit, all considerations yield to the best interest of the minor and the minor's interest in a stable, loving, and safe home environment. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best interest stage, the State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *Id.* at 366. In considering a minor's best interest, the trial court must consider certain statutory factors in light of the minors' ages and their developmental needs, which are (1) the physical safety and welfare of the minor, including food, shelter, health, and clothing; (2) the development of the minor's identity; (3) the minor's background and ties, including familial, cultural, and religious; (4) the minor's sense of attachments, including (i) where the minor actually feels love, attachment, and a sense of being valued, (ii) the minor's sense of security, (iii) the minor's sense of familiarity, (iv) continuity of affection for the minor, and (v) the least disruptive placement; (5) the wishes of the minor; (6) the minor's community ties, including church, school, and friends; (7) the minor's need for permanence, which includes the need for stability and continuity of relationships with parental figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the minor. 705 ILCS 405/1-3(4.05) (West 2016). A trial court's best interest determination will not be disturbed unless against the manifest weight of the evidence. *In re Austin W.*, 214 Ill. 2d 31, 51 (2005).

¶ 57        In this case, the State proved by a preponderance of the evidence that it was in S.P.'s best interest to terminate the respondent's parental rights. S.P. had been placed in the same foster family, alongside her two half sisters, for over 3½ years. While S.P. had initially struggled with not returning home to her mother, there was no such indication as to respondent. Since S.P. could not be returned to her mother, her preference was to remain in her current placement with her foster parents, who S.P. referred to as mom and dad. S.P.'s foster family was able to meet S.P.'s needs and was willing to adopt her and her two half sisters. Respondent testified that he had a bond with S.P., but no such claimed bond could be observed by the caseworker because respondent did not avail himself to the caseworker and did not schedule a single visit with S.P. through the caseworker during the entire case. At the best interest stage following a finding of respondent's parental unfitness, respondent's interest in maintaining the parent-child relationship must yield to S.P.'s interest in having a stable and loving home life. See *D.T.*, 212 Ill. 2d at 364. Thus, trial court's finding that it was in S.P.'s best interest to terminate

respondent's parental rights was not against the manifest weight of the evidence.

¶ 58                                      CONCLUSION
¶ 59             The judgment of the circuit court of Will County is affirmed.

¶ 60             Affirmed.