NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220629-U

NO. 4-22-0629

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 19JA309 |
| v. | ) | |
| Percy B., | ) | Honorable |
| Respondent-Appellant). | ) | Mary Linn Green, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Pursuant to *Anders v. California*, 386 U.S. 738 (1967), the appellate court granted counsel's motion to withdraw because no meritorious issues could be raised on appeal.

¶ 2       Respondent, Percy B., is the father of S.B. (born May 2015). In June 2022, the trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS 50/1 (West 2020)) and that termination of respondent's parental rights was in S.B.'s best interest.

¶ 3       Respondent appealed the trial court's judgment terminating his parental rights, and pursuant to *Anders v. California*, 386 U.S. 738 (1967), respondent's counsel on appeal moves to withdraw. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86, 732 N.E.2d 140, 143 (2000) (holding *Anders* applies to termination of parental rights cases and providing the proper procedure to be followed by appellate counsel). In his brief, appellate counsel contends that appeal of this case presents no potentially meritorious issues for review. We agree, grant appellate

counsel's motion to withdraw, and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Procedural History

¶ 6        In July 2019, the State filed a petition for adjudication of wardship, alleging S.B. was a neglected minor as defined by the Juvenile Court Act of 1987 (Act) in that his environment was injurious to his health and welfare because (1) his sibling was physically abused by his mother's paramour and (2) he lived in unsanitary conditions. 705 ILCS 405/2-3(1)(b) (West 2018). (We note that the State filed similar petitions regarding S.B.'s siblings but those petitions and siblings are not at issue in this appeal.) The same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of S.B. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 7        In September 2019, the trial court conducted an adjudicatory hearing, at which respondent was not present. The State informed the court that respondent was incarcerated and had told the caseworker that he wished "to participate with an attorney" but did not "want to be writted back" because he was engaged in services at the prison. The court appointed counsel for respondent and continued the hearing.

¶ 8        In October 2019, the trial court resumed the adjudicatory hearing, at which respondent was represented by counsel but did not personally appear. Counsel informed the court that she had spoken with respondent, who said he wanted to participate but did not want to be transported from Centralia, where he was incarcerated, to the court in Rockford. The court, after considering the evidence presented, found S.B. was a neglected minor as alleged in the petition.

¶ 9        In December 2019, the trial court conducted a dispositional hearing. Respondent again was represented by counsel but was not personally present. Counsel again represented that

respondent requested not to be transported to court. Respondent agreed with the State that he was unable, due to his incarceration, to care for S.B. and that custody and guardianship should be placed with DCFS.

¶ 10 The trial court found it was in the best interest of S.B. and the public that S.B. be made a ward of the court and adjudicated a neglected minor. The court further found respondent unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, and discipline the minor, and it would be contrary to the minor's health, safety, and best interest to be in his custody. The court placed guardianship and custody with the guardianship administrator of DCFS and ordered that "[v]isitation between the minor and the parents shall be at [the] discretion of DCFS." (We note that the State requested visitation be at the discretion of DCFS and respondent did not object.)

¶ 11 B. The Petition for Termination of Parental Rights

¶ 12 In March 2021, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because, among other things, he was depraved (750 ILCS 50/1(D)(i) (West 2020)).

¶ 13 1. *The Fitness Proceedings*

¶ 14 a. The Evidence Presented

¶ 15 In July 2021, the trial court conducted a hearing on the fitness portion of the termination proceedings. The State entered certified copies of three convictions for respondent. On April 26, 2001, respondent was convicted of armed robbery, a Class X felony (720 ILCS 5/18-2(a)(2) (West 2000)). On April 13, 2012, respondent was convicted of aggravated battery, a Class 3 felony (720 ILCS 5/12-3.05(c) (West 2010)). On September 27, 2017, respondent was convicted of aggravated robbery, a Class 1 felony (720 ILCS 5/18-1(b)(1) (West 2014)).

¶ 16    Charles Ward testified that he was the DCFS caseworker assigned to the case since its inception. Ward testified that respondent was incarcerated at the time of the initial service plan. Ward testified that S.B. was born in May 2015 and that respondent was in custody since November 2015. Respondent was sentenced to 22 years in prison on his November 2015 conviction, with an anticipated release date in 2026. Ward agreed that respondent was cooperative with DCFS, had completed some services in prison, and sent gifts and cards to his children.

¶ 17    Ward testified that visitation was difficult because respondent was incarcerated in Centralia and the children lived in Rockford. The several hour drive was hard on the children because they had behavioral issues. Ward stated that DCFS did conduct one in person visitation, but it "did not go well because of the age of the children *** [and] the lack of a place at the prison to do a safe visit." Ward explained that visits were thereafter conducted virtually.

¶ 18    On cross-examination, Ward admitted that DCFS never contacted the prison to (1) make referrals for services, (2) determine what services were available for respondent, or (3) determine which services respondent had already completed. Ward testified that respondent provided him certificates of completion for parenting and anger management classes. Respondent never refused visitation and participated in video visits once DCFS made them available to him.

¶ 19    Respondent testified that Ward never made referrals for respondent to get services but services were available for things like domestic violence at the discretion of the prison. Had Ward made the request, respondent could have been allowed to participate. Respondent was earning additional sentencing credit through a job assignment and had sought "COVID clemency in order to be released early" several months before the hearing but it was still "in the process."

¶ 20    Regarding visitation, respondent stated that he never had a phone call with his

- 4 -

children even though he had provided DCFS and the various foster parents with the information necessary to set up phone calls. Among other things, by the time a foster parent could add their phone number to the list of approved callers, the children would be moved. Respondent estimated that he had between 8 and 10 video visits during the life of the case, each lasting about 30 minutes. The visits always went well, and he was never told he did anything wrong. Respondent testified that the in-person visit went well and the children did not have any behavior issues that were not age appropriate. Respondent testified there was a visiting room for parents and children, although he acknowledged that that same room was also used for regular visitation. According to respondent, the visitation room had books and toys in it.

¶ 21    Respondent had spoken with Ward several times and each time asked Ward about his children—particularly, their physical health, how they were behaving, and whether they seemed happy in their placements. Respondent also requested pictures of his children whenever he could. Respondent sent cards, pictures, and gifts frequently to his children.

¶ 22    Respondent admitted that he was currently incarcerated for aggravated robbery, during which he had used a gun. Respondent stated he felt remorseful and that he had changed. Respondent testified that he provided care ("diapers, burping, bathing.") and financial support for S.B. for the first six months of his life before respondent was arrested.

¶ 23    The trial court continued the matter for closing arguments from the parties.

¶ 24                    b. Respondent's Motion To Dismiss

¶ 25    In August 2021, respondent *pro se* filed a motion to dismiss the State's motion to terminate parental rights, arguing that the proceedings were void because (1) the petition did not accuse respondent, personally, of any abuse or neglect of S.B.; (2) respondent was never served with an original copy of the petition; and (3) the State denied him visitation with his children.

¶ 26 In September 2021, the trial court reconvened the hearing on parental fitness. Respondent's counsel informed the court that she was not adopting respondent's *pro se* motions but requested they be considered as part of closing arguments. Respondent objected and, after consulting with his counsel during a recess, requested the court permit him to proceed *pro se*. The court granted respondent's request and vacated his counsel's appointment.

¶ 27 The trial court then addressed respondent's motion to dismiss. Respondent decided to "stand" on his motion, but he added that he believed the court lacked jurisdiction over him because he was never served with a file stamped copy of the petition to terminate parental rights; instead, he received an unstamped copy from his attorney. The State argued that (1) respondent was properly served at the beginning of the case, (2) respondent had voluntarily participated in the proceedings personally and through counsel, and (3) the petition for termination of parental rights was properly served on respondent's attorney. The court then took the matter under advisement.

¶ 28 In November 2021, the trial court denied respondent's motion to dismiss, finding that respondent had been served with summons in September 2019 and counsel was appointed for him that same day. The court further noted that the State properly served respondent's counsel with the petition for termination of parental rights. The court scheduled a new hearing date for closing arguments as to parental fitness.

¶ 29 Over the next six months, the case was continued for a variety of reasons, including illnesses, respondent's inability to appear due to prison lockdown or the lack of a video writ, and a new prosecutor's being assigned to the case.

¶ 30                    c. Respondent's Motion for Substitution of Judge

¶ 31 In January 2022, respondent filed a motion for substitution of judge, claiming that

the trial judge unreasonably refused to accept an oral writ or to have the court clerk draft a writ to allow respondent to return to court after he fired his attorney. According to respondent, the court " 'forced' " an opposing attorney to draft and submit the writ. Respondent claimed that by not exercising the court's power to writ persons to hearing, the judge had demonstrated clear bias. In addition, respondent claimed that he "pleaded with the Court" to enforce his rights to visitation but the court declined, stating "that visitation had always been at the discretion of DCFS, and dependent on whether or not it would be harmful to the children." Respondent stated the court refused to order visitation even after he provided caselaw holding that (1) incarcerated parents were entitled to visitation and (2) courts had broad discretion over visitation. Respondent asserted that the court had never made any finding that visitation with his children would be detrimental, which was a requirement before denying visitation entirely. Essentially, the judge's failure to rule in respondent's favor was the basis for his claim that she was biased.

¶ 32 In April 2022, respondent filed an amended motion, adding that the trial judge he was seeking to substitute had attempted to hear argument on his motion to substitute and permitted the State to argue in opposition to it. Respondent argued the court's actions (1) were contrary to the language of the statute, (2) constituted a denial of his rights to a fair and impartial hearing, and (3) further demonstrated the judge's bias.

¶ 33 In May 2022, a different trial judge heard argument on respondent's motion. Respondent argued at length that (1) he was denied visitation; (2) he was not served with documents; (3) proceedings occurred without his presence, just his attorney; and (4) he was being writted to court improperly. The trial court started by noting that it had reviewed the court file, motions, orders, and docket entries. The court then explained that the other judge's orders were very typical and did not show any bias or prejudice. In particular, the court stated that it knew

- 7 -

from personal experience that the Illinois Department of Corrections (DOC) required written writs before it would produce inmates for court hearings and it was common practice for judges to use other attorneys on a case to assist with filling out writ paperwork.

¶ 34 Regarding visitation, the trial court noted that the trial judge had not made any findings or entered any orders restricting visitation in any way and that respondent's complaints were more properly directed to DCFS, which had discretion over visitation. Because the record showed that the trial judge was not prejudiced, the court denied the motion for substitution of judge.

¶ 35 d. The Trial Court's Fitness Finding

¶ 36 In June 2022, the trial court concluded the hearing on the fitness portion of the termination proceedings. The court found that the State proved, among other things, respondent was depraved and respondent failed to rebut the presumption of depravity.

¶ 37 2. *The Best Interest Portion of the Termination Proceedings*

¶ 38 Immediately following the trial court's finding that respondent was unfit, the court conducted the best interest portion of the termination proceedings. At the State's request, the court took judicial notice of best interest reports that had been filed by various caseworkers prior to the hearing. Prior to taking judicial notice, the court confirmed with respondent that he had received copies of the reports.

¶ 39 The State called Sophia Fiorenza, who testified she was the caseworker for S.B. and that she visited S.B. three times a month. S.B. was seven years old and lived in a foster home with the foster mother's 20-year-old daughter and 12-year-old son, whom S.B. called "brother." The foster parent ran a licensed in-home daycare and provided a very structured life as a result. S.B. was included in all of the family's activities and had been thriving in the foster home. The

- 8 -

foster parent was meeting all of S.B.'s physical and emotional needs, including food, clothing, safety, and medical care.

¶ 40 Fiorenza explained that S.B. had an incident that led to him being psychiatrically hospitalized and moved from his prior placement, which he had shared with his biological siblings (respondent's other two children). Although S.B. was thriving in his placement, he still expressed an interest in going back to his prior placement and had not yet shown many physical signs of attachment to his new foster parent such as hugs and kisses. Fiorenza testified that no matter where S.B. ended up, it was in his best interest that parental rights be terminated in order to make him eligible for adoption. On cross-examination by respondent, Fiorenza agreed that she had not asked S.B. how he felt about respondent or consulted any psychological professional before authoring her report.

¶ 41 Respondent argued that he did not know he could call or subpoena witnesses to testify on his behalf. He argued that he would have called Ward and another caseworker, both of whom would have testified that his visits went well. He also objected to Fiorenza's report, arguing that she was not qualified to author a report because she did not see any interaction between S.B. and respondent. The trial court denied respondent's objection to Fiorenza's report, finding that respondent's arguments went to the weight to be given the evidence and not whether it was admissible.

¶ 42 The trial court found that it was in S.B.'s best interest to terminate respondent's parental rights.

¶ 43 C. Respondent's Appeal and the Motion To Withdraw

¶ 44 In July 2022, respondent filed a notice of appeal, and in August 2022, the trial court appointed counsel to represent respondent on appeal. In October 2022, appellate counsel

filed a motion to withdraw and served a copy on respondent. In December 2022, respondent filed a response opposing the motion and arguing that the trial court's judgment should be reversed.

¶ 45                    D. Illinois Supreme Court Rule 311(a)

¶ 46        The notice of appeal in this matter was filed in the trial court July 19, 2022, and in the Appellate Court July 26, 2022. The case was dismissed August 23, 2022, for failure to file a docketing statement. The Winnebago County Circuit Court appointed counsel on appeal August 31, 2022. Subsequently, this court vacated the dismissal order and reinstated the appeal September 1, 2022. Due to this delay, the court was unable to meet the 150-day deadline to issue a decision, the dismissal and subsequent reinstatement being good cause as provided for in Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018).

¶ 47                              II. ANALYSIS

¶ 48        Appellate counsel argues that the appeal of this case presents no potentially meritorious issues for review. He identifies the following as potential issues for review: (1) whether the trial court's (a) unfitness and (b) best interest findings were against the manifest weight of the evidence and (2) whether the trial court erred by denying respondent's (a) motion to dismiss and (b) motion for substitution of judge. Appellate counsel has explained in detail in his motion why each of these issues lack merit.

¶ 49        Respondent filed a brief in opposition to counsel's motion to withdraw. In that brief, respondent reiterates the arguments highlighted by appellate counsel as meritless. For instance, respondent continues to maintain that his motion for substitution of judge should have been granted because the judge (1) conducted hearings without respondent being present and (2) permitted DCFS to deny all visitation. Respondent further asserts that his motion to dismiss should have been granted because (1) he was never accused of any actions constituting abuse or

neglect and (2) he was never served with a copy of the original petition. Finally, respondent argues the reports submitted to the trial court for the best interest hearing were from undisclosed and unqualified caseworkers.

¶ 50    Because we agree with appellate counsel and disagree with respondent, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 51                    A. The Trial Court's Fitness Determination

¶ 52                            1. *The Applicable Law*

¶ 53    The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(i) of the Adoption Act provides that there is a rebuttable presumption that a parent is depraved—and therefore unfit—if the parent "has been criminally convicted of at least 3 felonies under the laws of this State or any other state *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2020). "In Illinois, the term 'depravity' means an inherent deficiency of moral sense and rectitude. [Citation.] The State shows depravity by establishing that respondent has a deficiency in moral sense and either an inability or an unwillingness to conform to accepted morality." (Internal quotation marks omitted.) *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 18, 115 N.E.3d 1003.

¶ 54    Once the State makes a *prima facie* showing of depravity, the burden of rebutting the presumption of depravity rests on the parent. *In re J.A.*, 316 Ill. App. 3d 553, 562, 736 N.E.2d 678, 686 (2000). The parent must come forward with evidence "showing that, despite his convictions, he is not depraved." *Id.* "Rehabilitation can only be shown by a parent who, upon leaving prison, maintains a lifestyle suitable for parenting children safely." *In re J.V.*, 2018 IL

App (1st) 171766, ¶ 183, 115 N.E.3d 1099.

¶ 55                                  2. *The Standard of Review*

¶ 56        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. " 'The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent[,] and the reviewing court will give such a determination deferential treatment.' " *J.V.*, 2018 IL App (1st) 171766, ¶ 184 (quoting *J.A.*, 316 Ill. App. 3d at 563). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id.*

¶ 57                                        3. *This Case*

¶ 58        Counsel explains that any claim that the trial court's finding that respondent failed to rebut the presumption of depravity was incorrect lacks arguable merit. We agree.

¶ 59        The State presented certified copies of respondent's three most recent felonies: one for armed robbery in 2001, another for aggravated battery in 2012, and a third for aggravated robbery in 2017. Respondent admitted he committed these crimes and noted that he committed the aggravated robbery in November 2015, when S.B. was just six months old. Respondent further explained that he committed that robbery with a firearm and his release date was not until 2026.

¶ 60        Respondent's only testimony to rebut the presumption of depravity was that he was remorseful of his crimes, and he had finally learned that it was time for him to stop engaging

in acts that would take him away from his children. However, respondent also testified he was born in 1963 and admitted on cross-examination by the guardian *ad litem* that he committed several other felonies between 1981 and 1995. Respondent could not point to any actions outside of prison that demonstrated a lifestyle suitable to raising children because he committed aggravated robbery with a firearm shortly after S.B. was born. Given respondent's age and admission of an extensive criminal history, the trial court correctly concluded that respondent failed to rebut the presumption of depravity and the State proved by clear and convincing evidence that respondent was depraved.

¶ 61                    B. The Trial Court's Best Interest Determination

¶ 62          Next, appellate counsel argues that the record demonstrates that no meritorious claim exists that the trial court's best interest finding was against the manifest weight of the evidence. After reviewing the transcripts provided, we likewise conclude no irregularities are present and no arguably meritorious issues may be raised on appeal. Most important, the record establishes that respondent will not be in a position to begin to parent S.B. until 2026. At that time, S.B. will be 11 years old. In the meantime, S.B. deserves a parent who can be physically present and provide for his physical safety and emotional well-being.

¶ 63          We also note that respondent did not present evidence concerning the best interest of S.B., and Fiorenza testified that S.B. was thriving in his foster home. Accordingly, we conclude that the trial court's best interest determination was well supported.

¶ 64          On appeal, respondent claims he did not have copies of the reports and the State did not disclose Fiorenza as a witness. However, the trial court asked respondent if he had received the reports, and he stated that he had. At the best interest hearing, respondent never objected that the witnesses or their testimony was a surprise. Regarding his objection as to

Fiorenza's qualifications, the court correctly observed that argument addressed the weight the court should give the evidence not whether the evidence was admissible.

¶ 65                          C. Respondent's Arguments on Appeal

¶ 66                          1. *The Motion To Dismiss*

¶ 67        Regarding respondent's motion to dismiss, respondent misapprehends that juvenile abuse and neglect proceedings concern the status of the child and not the actions of the parents. It is well settled that proceedings are appropriate so long as the child is neglected; neither parent need be "at fault" to be a part of the proceedings. *In re R.B.*, 336 Ill. App. 3d 606, 614, 784 N.E.2d 400, 407 (2003) ("[T]he Act empowers juvenile courts to intervene on behalf of a child when that child's condition warrants intervention, not when the conduct or 'guilt' of a parent or guardian warrants it."). All that matters is whether the child has been neglected. *Id.* ("[T]he purpose of juvenile court proceedings is to determine the *status* of the child on whose behalf the proceedings are brought, *not* to determine any particular person's criminal or civil liability." (Emphases in original.))

¶ 68        Here, the trial court found S.B. was neglected because, among other things, S.B.'s siblings were physically abused by their mother's paramour. Accordingly, the case was properly initiated, and the trial court correctly adjudicated S.B. a neglected minor. We also note that respondent did not appeal or challenge the dispositional order, which would have been the proper avenue for respondent to challenge the adjudication of neglect. Because the dispositional order is considered a final order and respondent did not file a notice to appeal that order within 30 days of its entry, this court now lacks jurisdiction to review that order. *In re Ja. P.*, 2021 IL App (2d) 210257, ¶ 24, 191 N.E.3d 771.

¶ 69        Additionally, regardless of how respondent was served with the pleadings in this

case, respondent participated personally and by counsel throughout the proceedings. Indeed, respondent appeared at the parental fitness portion of the termination proceedings and testified on his own behalf. Participation in court proceedings constitutes a waiver of any objection to jurisdiction or service of process. 705 ILCS 405/2-15(7) (West 2018); *In re A.M.*, 402 Ill. App. 3d 720, 724, 932 N.E.2d 82, 86 (2010); *In re S.P.*, 2019 IL App (3d) 180476, ¶¶ 31-38, 123 N.E.3d 1101. The motion to dismiss was properly denied and any argument to the contrary is without merit.

¶ 70                                     2. *Motion for Substitution of Judge*

¶ 71          Any argument that respondent's motion for substitution of judge should have been granted is similarly meritless. A party in an abuse and neglect proceeding is entitled to seek substitution of a judge only for cause once that judge has made a substantive ruling. 705 ILCS 405/1-5(7) (West 2020). The party seeking substitution must meet the "heavy burden" of demonstrating "actual prejudice" in the form of personal bias or prejudicial trial conduct. *In re Marriage of O'Brien*, 393 Ill. App. 3d 364, 373, 912 N.E.2d 729, 738 (2009). For either bias or prejudice to merit substitution, "it must normally stem from an extrajudicial source, *i.e.*, from a source other than from what the judge learned from her participation in the case before her. A judge's previous rulings almost never constitute a valid basis for a claim of judicial bias or partiality." *In re Estate of Wilson*, 238 Ill. 2d 519, 554, 939 N.E.2d 426, 447 (2010).

¶ 72          Respondent claims the trial court proceeded in his absence. However, the record demonstrates that the trial court was fastidious in ensuring respondent was able to attend the hearings, either in person or remotely, and was careful to comply with DOC's requirements to permit his attendance, which is why the court continued to have written writs prepared notwithstanding respondent's assertion that an oral writ would suffice.

¶ 73        Respondent also claims that the trial court somehow erred by giving DCFS the sole discretion to determine visitation. Respondent provides no authority in support of his position. The court was authorized to vest DCFS with the discretion to make such a determination and experience shows the same to be standard practice. Once again, the record reveals that throughout the proceedings, the court and DCFS were concerned with the children's best interests. In-person visits were not possible due to the children's young ages and the extreme travel distance. It was reasonable for DCFS to determine that lengthy travel for visits in a room at an adult correctional facility was difficult on the children and contrary to their best interests. Moreover, the issue of visitation was raised by respondent's counsel and addressed by the trial court at permanency review hearings, which resulted in respondent finally receiving video visits. Thereafter, COVID-19 and placement changes also caused problems. However, the trial court's actions were clearly not the product of bias.

¶ 74        We conclude that the record in this case shows no prejudice on the part of the trial judge which would have required her recusal or substitution.

¶ 75                            III. CONCLUSION

¶ 76        For the reasons stated, we agree with appellate counsel that no meritorious issues can be raised on appeal. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment. *Anders*, 386 U.S. at 744. We thank appellate counsel for his detailed brief, which this court found very helpful.

¶ 77        Affirmed.