NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250323-U

NO. 4-25-0323

IN THE APPELLATE COURT

FILED
August 19, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* K.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | No. 21JA78 |
| v. | ) | |
| Shane C., | ) | Honorable |
| Respondent-Appellant). | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appointed appellate counsel's motion to withdraw and
affirmed the trial court's judgment terminating respondent's parental rights to his
minor child.

¶ 2    Respondent, Shane C., appealed the trial court's judgment terminating his

parental rights to his minor child, K.C. (born July 2021). Counsel was appointed to represent

respondent on appeal. Appointed counsel now moves to withdraw on the basis he can raise no

colorable argument the court erred in terminating respondent's parental rights. For the reasons

that follow, we grant appointed counsel's motion and affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4    On July 30, 2021, the State filed a petition for adjudication of wardship, alleging

K.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile

Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the State alleged K.C.'s mother

(and respondent's paramour), Brooke T.—who is not a party to the instant appeal—"had an inconclusive positive test for amphetamines when she presented at the hospital for the minor's birth" and the test had "been sent out for confirmation, along with the minor's cord blood for testing." The State further alleged Brooke T. "demonstrated paranoid behaviors, such as stating people were stalking her, breaking into her home, spying on her and putting drugs in her food" and respondent "shared similar beliefs." According to the State's petition, Brooke T. was married to Clinton T. at the time of K.C.'s birth.

¶ 5        On February 17, 2022, Brooke T. stipulated to the allegations in the State's petition and the trial court entered an adjudicatory order finding K.C. neglected.

¶ 6        On March 17, 2022, respondent, although not yet a party to the underlying proceedings, appeared at the scheduled dispositional hearing. Respondent informed the trial court that he was K.C.'s biological father and he wanted "to state [his] intent to establish paternity which [he] was never allowed to do." The court denied respondent's request and ordered him to leave the courtroom because "[t]he State of Illinois and the law does not recognize anybody other than Clinton T[.] as the father of this child." The parties agreed to continue the dispositional hearing.

¶ 7        On April 7, 2022, the trial court conducted the dispositional hearing. The court noted at the outset that it had received the State's dispositional hearing report. According to the report, it had been confirmed that Brooke T. tested positive for methamphetamine at the time of K.C.'s birth and K.C.'s "blood cord test" was positive for both methamphetamine and amphetamines. Following the hearing, the court entered a dispositional order adjudicating K.C. neglected and making her a ward of the court.

¶ 8        Respondent entered his appearance at a permanency review hearing held on

- 2 -

September 30, 2022. At the hearing, the State informed the trial court that respondent and Brooke T. had "executed an Illinois Voluntary Acknowledgment of Paternity and [Clinton T.'s] denial of paternity."

¶ 9 On July 19, 2024, the State filed an amended, supplemental petition to terminate respondent's parental rights to K.C. The State alleged the following grounds for parental unfitness: (1) respondent failed to make reasonable efforts to correct the conditions which led to K.C.'s removal from his care during the nine-month periods from October 1, 2022, to July 1, 2023, and from July 2, 2023, to April 2, 2024 (750 ILCS 50/1(D)(m)(i) (West 2024)); and (2) respondent failed to make reasonable progress toward K.C.'s return "to the mother" during the same nine-month periods (*id.* § 1(D)(m)(ii)).

¶ 10 On December 4, 2024, the trial court conducted a fitness hearing. The State called as witnesses Katelynn Ramirez and Ellen Nagle. Respondent did not present any evidence.

¶ 11 Ramirez, K.C.'s caseworker from July 2021 to April 2023, testified that K.C. initially came into care due to substance abuse and mental health concerns involving both Brooke T. and respondent. Ramirez testified that respondent participated in an integrated assessment around the time of case opening and he "was recommended to do a substance abuse evaluation, random drug testing, a mental health evaluation, a psychological evaluation, parenting capacity, *** domestic violence victim services, and then housing, income, and parenting education." Ramirez testified respondent completed a substance abuse evaluation in August 2021, and no further treatment was recommended. However, according to Ramirez, the agency deemed the evaluation invalid because respondent had refused to sign documentation allowing the agency to share relevant information with the evaluator. Ramirez requested that respondent sign the documentation and complete an updated evaluation, but respondent refused

to do so. Ramirez further testified that respondent never completed a mental health assessment or psychological evaluation during her time on the case, nor did he complete any of the required drug screenings. According to Ramirez, although respondent was largely consistent in attending visitation with K.C., he was unable to ever progress to unsupervised visitation because "[t]here wasn't engagement" in either substance abuse or mental health services, which were the two main concerns that brought K.C. into care.

¶ 12    Nagle testified that she was the supervisor on K.C.'s case from April 2023 until December 2023. Nagle testified that respondent completed a psychological evaluation in June 2023. Based on the evaluation, it was recommended he participate in psychiatric services and counseling. However, respondent informed Nagle "that he did not need mental health treatment and was not interested in seeking out psychiatric services." Nagle testified respondent completed a drug screening in May 2023 that was positive for methamphetamine and he failed to complete any substance abuse services during her time on the case.

¶ 13    Following the parties' arguments, the trial court found the State had proven each allegation of parental unfitness by clear and convincing evidence. In relevant part, the court provided the following reasoning in open court:

"[T]here is no compliance with directives in the service plan, and that's relevant. [Drug screenings,] he didn't attend those, so those are presumed positive. The one that he did attend, [the State] indicated he tested positive. He did a substance abuse assessment I believe they said in August of 2022. He was not deemed to be the father until October of 2022. So the agency had asked that he redo that evaluation although the one in August had said he didn't need anything further. After that, [respondent] just refused to do anything. So compliance with

- 4 -

directives.

* * *

You—a parenting capacity, you show up but you leave. There is—[t]he State has met their burden of proof by clear and convincing evidence that specifically—I want to make this clear that between October 1st of 2022 to December 30th of 2023, you have failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from you from October 1, 2022, which is when you were found to be the father, to December 31, 2023. That's the evidence that the State presented. And that you failed to make reasonable progress. And I mean reasonable in capital letters because you did inches, not miles, towards the return of this child to you from October 1st of 2022 to December 31, 2023.

I have no evidence from January 1st of 2024 to April of 2024, but as far as this Court is concerned—again, the hang-ups on the nine-month period—I'm looking at the life of this case. Technically, [respondent] wasn't quote/unquote on the hook as the father until October 2022, but he had from October 2022 to December 31, 2023, so 14 months, to correct the conditions and make efforts, substantial efforts, 14 months for the return of the child.

So for those reasons, the Court is finding that the State has met its burden."

¶ 14 On March 17, 2025, the trial court conducted a best interest hearing. The State introduced a best interest report into evidence without objection and called Tim Jensen as its only witness. Respondent did not present any evidence.

- 5 -

¶ 15    Jensen, K.C.'s caseworker since April 2024, testified that K.C. had been living with her foster mother, who was respondent's ex-wife, since K.C. was released from the hospital following her birth in July 2021. In addition to K.C. and the foster mother, the foster home consisted of the foster mother's three older daughters, who were also K.C.'s half-sisters. Jensen testified that he visited the home on a monthly basis to observe K.C. interact with her foster family. Jensen described K.C.'s interactions with her foster mother as "a normal interaction between a mother and daughter," and he indicated that K.C.'s half-sisters were "very protective and caring and nurturing for [K.C.]" On the other hand, Jensen testified that, while K.C. knew respondent was "Dad," he had "not seen any sort of bond" between them. According to the best interest report, the foster mother consistently met K.C.'s "safety, educational, developmental, well-being ***, and medical needs." The report further indicated that the foster mother "has supportive friends and family which have and are willing to provide assistance and support as needed." Jensen testified that the foster mother had expressed her willingness to provide K.C. with permanence. Jensen opined that termination of respondent's parental rights was in K.C.'s best interest.

¶ 16    Following the parties' arguments, the trial court found the State had proven termination of respondent's parental rights was in K.C.'s best interest by a preponderance of the evidence. The court provided the following reasoning in support of its decision:

> "[THE COURT:] And here we are almost four years later. Four years that this child has grown and been in the same placement. And that's who she identifies as her family because kids like consistency. Kids like seeing the same people in their lives, not, hey, when I have time, I think I'll do the things I need to do. Because—I'm sorry—there's not a time machine that makes time stand still.

So now here we are. She's three and a half. And the people she identifies every day are her sisters—her siblings, I should say—and this woman as her mother because they have provided love, support, and consistency and placed her needs above everybody else's. So under the Juvenile Court Act, when the Court looks at the best interest of the minor, her physical safety and welfare has been protected by [the foster mother].

And I'm going to assume that those other children that reside with [the foster mother] belong to [respondent]—

[RESPONDENT]: Correct.

THE COURT:—so his other children. I don't know how old those children are, but according to Mr. Jensen's testimony, those siblings care and protect this minor child.

The development of her identity ***, [s]o at three and a half years old, this child's reaction is to run to [the foster mother], who she refers to as Mom, and her siblings for safety and well-being and identity. That's who she identifies as her people.

Her background and ties, well, her background is that she is a child of [Brooke T.] and [respondent]. But what better scenario than to be with her siblings?

Her wishes, she's only three and a half, so I can't really consider those. Her community ties, again, her ties and her identity all rolled up into one with [the foster mother] and the siblings.

And this child's overall need for permanence. In four years, four years,

[respondent] has not advanced to unsupervised visits. He's not consistent. He's not reliable. *** So the nature and length of this child's relationship with [the foster mother] and her siblings would certainly have a negative emotional and psychological impact to this child's well-being.

So, for those reasons, I am terminating your parental rights to this child, and the goal is going to be changed to adoption because [the foster mother] is willing to provide the permanency with your other children and her, which I think is in this child's best interest to be with family. So that is the ruling of the Court."

¶ 17        This appeal followed.

¶ 18                                II. ANALYSIS

¶ 19        On appeal, appointed counsel moves to withdraw on the basis he can raise no colorable argument the trial court erred in terminating respondent's parental rights to K.C. Counsel asserts that he identified three conceivable appellate issues but ultimately determined each issue lacks arguable merit. Specifically, counsel has identified the following possible issues in his motion and accompanying brief: (1) whether the neglect proceedings—*i.e.*, the adjudicatory and dispositional stages—were conducted in violation of the Juvenile Court Act, (2) whether the court erred in finding respondent unfit, and (3) whether the court erred in finding termination of respondent's parental rights was in K.C.'s best interest.

¶ 20                            A. Neglect Proceedings

¶ 21        First, counsel contends he considered challenging the neglect proceedings on the bases respondent was not allowed to appear at the dispositional hearing and both the adjudicatory and dispositional hearings were conducted in violation of the timing requirements set forth in the Juvenile Court Act. See 705 ILCS 405/2-14(b), 2-21(2), 2-22(4) (West 2022) (setting forth the

timing requirements for conducting adjudicatory and dispositional hearings). However, counsel contends any challenge to the adjudicatory or dispositional orders would be frivolous, as this court would lack jurisdiction to address a challenge to either order where no notice of appeal was filed within 30 days of the entry of the dispositional order. The issue of this court's jurisdiction involves a question of law, which is reviewed *de novo*. See, *e.g.*, *People v. Salem*, 2016 IL 118693, ¶ 11.

¶ 22 "Appeals from final judgments entered in proceedings under the Juvenile Court Act, other than delinquent minor proceedings, are governed by the rules applicable to civil cases." *In re Leona W.*, 228 Ill. 2d 439, 456 (2008) (citing Ill. S. Ct. R. 660 (eff. Oct. 1, 2001)). To perfect an appeal in a civil case where no posttrial motion has been directed against the judgment, an appellant must file a notice of appeal within 30 days of the entry of a final order. See Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). "Dispositional orders from juvenile court are generally final and appealable" (*In re D.D.*, 212 Ill. 2d 410, 418 (2004)), whereas, in general, "an adjudicatory order is not a final and appealable order" (*In re M.J.*, 314 Ill. App. 3d 649, 655 (2000)). "Appealing a dispositional order is the proper vehicle for challenging [an adjudicatory order]." *Leona W.*, 228 Ill. 2d at 456. "Compliance with the rules governing the deadline for filing a notice of appeal is mandatory and jurisdictional." *M.J.*, 314 Ill. App. 3d at 654.

¶ 23 Here, no notice of appeal was filed within 30 days of the entry of the dispositional order, and the fact that respondent did not become a party to this case until after the expiration of the 30-day deadline does not excuse him from compliance with the requirements of the supreme court rules governing appeals. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 217-218 (2009) ("[T]he appellate court does not have the authority to excuse the

filing requirements of the supreme court rules governing appeals."); *In re D.A.*, 2025 IL App (4th) 250120-U, ¶¶ 22-23 (finding we lacked jurisdiction to address a challenge to the neglect proceedings under circumstances similar to those in the instant case). Accordingly, we agree with counsel that any challenge to the adjudicatory or dispositional orders would be frivolous, as we would lack jurisdiction to review those orders where no notice of appeal was filed within 30 days of the entry of the dispositional order. See, *e.g.*, *In re S.P.*, 2019 IL App (3d) 180476, ¶ 47 ("Because the time to appeal the adjudication and dispositional orders has lapsed, we lack appellate jurisdiction to review those orders.").

¶ 24                               B. Unfitness Finding

¶ 25          Next, counsel contends he could arguably challenge three of the four grounds underlying the trial court's unfitness finding, but he asserts he can raise no colorable argument challenging the court's final ground for unfitness—*i.e.*, that respondent failed to make reasonable efforts to correct the conditions which led to K.C.'s removal during the nine-month period from October 1, 2022, to July 1, 2023. "A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 26          Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2024)) "delineates a two-step process in seeking termination of parental rights involuntarily." *In re J.L.*, 236 Ill. 2d 329, 337 (2010). First, the State must prove by clear and convincing evidence that the parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re*

*D.D.*, 196 Ill. 2d 405, 417 (2001). Section 1(D)(m)(i) of the Adoption Act provides, in relevant part, that a parent is unfit for failing "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i) (West 2024). "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent [citation], and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). "The reviewing court must determine whether the parent has made 'earnest and conscientious' strides toward correcting the conditions that led to the removal of the minor." *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 27        Here, we agree no colorable argument can be made that the trial court erred in finding respondent failed to make reasonable efforts from October 1, 2022, to July 1, 2023. The State's evidence demonstrated that K.C. came into care as a result of substance abuse and mental health concerns involving both Brooke T. and respondent. However, respondent made essentially no effort to correct these concerns during the relevant nine-month period. With respect to the substance abuse concerns, respondent refused to sign documents allowing the agency to disclose pertinent information about his case to substance abuse treatment providers. Respondent's refusal prevented him from ever completing a valid substance abuse evaluation and receiving the necessary treatment. Moreover, respondent completed just one drug screening throughout the case, and it was positive for methamphetamine—the same substance K.C. had been exposed to at birth. With respect to the mental health concerns, respondent refused to complete either a mental health assessment or a psychological evaluation. Indeed, according to Nagle, respondent informed her "that he did not need mental health treatment and was not interested in seeking out

psychiatric services." Given respondent's near-total lack of effort in correcting the substance abuse and mental health concerns which led to K.C.'s removal, no argument can be made that the court erred in finding him unfit for failing to make reasonable efforts. Accordingly, any argument challenging the remaining grounds for the court's unfitness finding would be pointless. See *M.J.*, 314 Ill. App. 3d at 655 ("[I]f there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness.").

¶ 28                              C. Best Interest Determination

¶ 29          Lastly, counsel contends he considered challenging the trial court's best-interest determination but ultimately determined any such challenge would be frivolous. A trial court's best interest determination will not be reversed unless it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 30          Where the State has satisfied its burden of proving the respondent unfit, the proceedings advance to the second stage, where the State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. 705 ILCS 405/2-29(2) (West 2024). At the best interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3(4.05) of the Juvenile Court Act lists the best interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's

wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024).

¶ 31 Here, no argument can be made that the trial court's best interest determination was against the manifest weight of the evidence. The State's evidence showed that K.C. had been living in the same foster home since her release from the hospital shortly after her birth. The foster family was comprised of respondent's ex-wife and K.C.'s three half-sisters. Jensen testified that K.C. was bonded with her foster mother, whom she referred to as "Mom or Mommy," and K.C.'s siblings were "very protective and caring and nurturing for [her]." According to the best interest report, the foster mother consistently met K.C.'s "safety, educational, developmental, well-being ***, and medical needs." The foster mother had also expressed her willingness to provide K.C. with permanence through adoption. On the other hand, no significant bond had been observed between respondent and K.C. and, importantly, respondent had made neither effort nor progress in having K.C. returned to his care during the three-plus years since her removal. Thus, any argument the court's best interest determination was against the manifest weight of the evidence would be frivolous.

¶ 32                                    III. CONCLUSION

¶ 33 For the reasons stated, we grant appointed appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 34 Affirmed.