# Illinois Official Reports

## Appellate Court

---

**In re Ja. P., 2021 IL App (2d) 210257**

---

Appellate Court
Caption

*In re* Ja. P. and A.P., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Megan P., Respondent-Appellant).

District & No.

Second District
No. 2-21-0257

Filed

September 29, 2021

Decision Under
Review

Appeal from the Circuit Court of Winnebago County, Nos. 19-JA-128, 19-JA-129; the Hon. Mary Linn Green, Judge, presiding.

Judgment

Appeal dismissed.

Counsel on
Appeal

Azhar J. Minhas, of Belvidere, for appellant.

Joseph W. Hanley, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Richard S. London, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Jorgensen and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Megan P., appeals from the trial court's judgment finding her unfit and terminating her parental rights. As we explain below, this appeal is dismissed for lack of appellate jurisdiction.

¶ 2                                  I. BACKGROUND

¶ 3    Megan is the mother of three children: A.P., born in 2009; Ja. P., born in 2012; and Jo. P., born in July 2014. This case concerns Megan's rights over only her daughter A.P. and her son Ja. P.

¶ 4    On March 21, 2019, Megan was observed walking through a parking lot with four-year-old Jo. P. when Jo. P. fell. Megan then began to kick Jo. P. and yell at him. A.P. and Ja. P. were also present. The incident was captured on video and reported to the Department of Children and Family Services (DCFS). During a subsequent investigation, Jo. P reported that his mother had kicked him in his side while she was wearing her boots. A.P. reported that her mother had left them alone to run into a store. A.P. also stated that she had seen her mother crush up powder and use a dollar bill to snort the substance while the children were in the car with her. Megan denied kicking Jo. P. (despite the video evidence) but later admitted to using heroin.

¶ 5    On March 26, 2019, a second report was made to DCFS. The reporter relayed that Megan had left the children in a car, unsupervised, while she went to a person's home and performed a sex act for money. Megan then took the money, purchased heroin, and snorted it in front of the children. The reporter stated that Megan regularly left the children alone in the car while she performed sex acts, that she used heroin in front of the children, and that she drove the children while she was high. The reporter expressed concern that Megan often drove fast and neglected to buckle the children in when she was high. In addition, the reporter stated that Megan was aggressive and belligerent to the children when she was high. DCFS took protective custody of the children.

¶ 6    On March 28, 2019, the State filed neglect petitions, and a temporary shelter care hearing was held. One of the allegations contained in the State's petition was that the children were in an injurious environment due to Megan's substance abuse, which prevented her from properly parenting. See 705 ILCS 405/2-3(1)(b) (West 2018). Megan was present in court and advised that, if she did not appear for subsequent court dates and her failure to appear was determined to have been willful, then she will have waived her right to appear. Megan then stipulated that there was probable cause to believe that the children were neglected and that there was an urgent and immediate need to remove the children from her care. The court granted DCFS temporary guardianship and custody of the children. This first hearing was the last time Megan appeared in court on this matter.

¶ 7    On May 30, 2019, the State noted that there was a warrant for Megan's arrest for check fraud. The court speculated that the warrant was likely the reason for Megan's failure to appear since the shelter care hearing.

¶ 8    On July 17, 2019, one of the children's caseworkers from Youth Services Bureau (YSB) sent a report to the court noting that A.P. and Ja. P. were placed with their maternal uncle and

were doing well in their placement. (Jo. P. was placed with his father's cousin.) In the meantime, the caseworker had no contact with Megan.

¶ 9 On July 23, 2019, Ja. P.'s and Jo. P.'s respective fathers stipulated to the injurious environment allegation. With respect to A.P., the State submitted "indicated packets," which contained the investigative reports filed by DCFS. The court adjudicated all three children neglected and made them wards of the court.

¶ 10 At a dispositional hearing on November 15, 2019, Megan's counsel stated that he had no contact with Megan and had no knowledge of her whereabouts. Megan's counsel made a motion for a continuance but also candidly noted that, if the court granted the motion, counsel had no way to inform Megan about any later court dates. The trial court denied the continuance. A YSB caseworker testified regarding the agency's repeated attempts to locate or contact Megan. During the dispositional hearing, multiple references were made to the fact that Megan had never contacted any caseworker, had not participated in any available services, and had not visited any of the children. Megan's counsel made an objection to the entry of the dispositional order for the record. The trial court found that Megan was unwilling to care for, train, or discipline the children and was dispositionally unfit.

¶ 11 A permanency hearing was held on February 5, 2020. Megan's counsel noted that he had no contact with her. The trial court heard evidence that the children were doing well in their placements. The court also found that DCFS and YSB had made reasonable efforts and that Megan had not made reasonable efforts or reasonable progress toward the children's return.

¶ 12 A second permanency hearing was held on July 6, 2020. Megan was not present. It was determined that Megan had been arrested and brought to the county jail. A caseworker testified that she spoke to Megan in the jail and provided her with copies of her service plans; however, there was no evidence that Megan attempted to contact YSB after she was released. The court again found that she had not made reasonable efforts or reasonable progress.

¶ 13 Megan failed to appear at a third permanency hearing on October 1, 2020. After hearing evidence, the court accepted the State's argument and changed A.P.'s and Ja. P.'s permanency goals to substitute care pending a determination on termination of parental rights.

¶ 14 On October 5, 2020, the State filed petitions seeking termination of Megan's parental rights, which alleged four grounds of unfitness. Specifically, the State alleged that Megan (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) failed to protect the children from conditions within their environment that were injurious to the children's welfare (*id.* § 1(D)(g)); (3) failed to make reasonable efforts to correct the conditions that were the basis for the children's removal from her care within specified nine-month periods (*id.* § 1(D)(m)(i)); and (4) failed to make reasonable progress toward the children's return to her care within specified nine-month periods (*id.* § 1(D)(m)(ii)). The State's petition sought to terminate Megan's parental rights and to have DCFS's guardianship administrator appointed as the children's guardian with the power to consent to A.P.'s and Ja. P.'s adoption.

¶ 15 On February 18, 2021, an unfitness hearing was held. The court heard evidence that Megan failed to complete her initial intake assessment, that she failed to complete any of the goals in her service plans, and that she had not contacted the children or their caseworkers since protective custody was taken. The children's guardian *ad litem* stated that the children had no real relationship with Megan and that Megan has never once inquired about their welfare

during the two-year history of this case. The court found Megan unfit on all four grounds alleged in the State's petition.

¶ 16 On April 15, 2021, the court held a best interests hearing. At the start of the hearing, Megan's counsel noted that Megan had been booked into the county jail on March 20, but apparently declined to be present for the hearing. The court heard testimony that A.P. and Ja. P, now 11 and 9, were doing well in their placement with their uncle. A caseworker described A.P. as a "very girly girl" who is sociable and enjoys her dolls, going shopping, getting her hair done, and playing on her iPad. A.P. is also doing very well in school. Ja. P. has some difficulty in school with reading but is receiving extra academic help. Otherwise, Ja. P. is a "little bit" hyper and could get into trouble but is kind and very outgoing and loves to play outside.

¶ 17 The caseworker testified that the children's uncle has been an excellent foster parent for over two years. He makes sure the children do their schoolwork and takes them to doctors and dentist appointments. In addition, the children's uncle has a support system of family members in the area who are able to help with the children as needed. The caseworker noted that the children have always seemed happy in their foster home, and she has observed them joke, laugh, and play with their toys. The children's uncle has committed to their adoption. The trial court found that it was in A.P.'s and Ja. P.'s best interests to terminate Megan's parental rights.

¶ 18 A timely notice of appeal was filed on Megan's behalf, and the trial court appointed counsel to represent her on appeal.

¶ 19 II. ANALYSIS

¶ 20 A timely notice of appeal is a jurisdictional step that initiates appellate review. *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 340 (2001). The question of whether we have jurisdiction to consider what the appellant has raised depends on more than the notice of appeal, however.

¶ 21 In this case, despite having taken an appeal from the order terminating parental rights, Megan's counsel takes aim solely at the adjudicatory order. Specifically, based on a strained reading of our decision in *In re T.C.*, 2021 IL App (2d) 200691, Megan's counsel alleges that the adjudication that the children were neglected is "void as to her" because two of the children's fathers stipulated to the injurious environment allegation in count II of the neglect petition.

¶ 22 As an initial matter, while Ja. P.'s father stipulated to the allegation, A.P.'s father was not a part of the proceedings. Rather, A.P. was adjudicated neglected after the court independently considered evidence submitted by DCFS. In addition, we note that counsel supports his position—effectively defending Megan's absence from the adjudicatory hearing—by referring to a comment made by the trial court at the shelter care hearing. During the shelter care hearing, when the parties were discussing a status date, the court told Megan that she did not need to be present for the initial status date and it would "excuse [her]" absence. Counsel implies that Megan either might have been confused or might have believed that the trial court was excusing her from *all* future dates. That argument is *not* well taken. For one thing, there can be no mistaking that the trial court's statement applied to the status hearing *only*. Also, the court's brief statement came as an aside and at the end of the court's arraignment of Megan on the State's neglect petition where, during the admonishments, the court emphasized the need for Megan's appearance at critical stages of the proceedings. Thus, contrary to counsel's

- 4 -

suggestion, the court did *not* give Megan any sort of pass to skip all future proceedings without consequence. Counsel's interpretation of the record is simply not reasonable.

¶ 23    More importantly, as the State correctly notes, we lack jurisdiction over the arguments pertaining to alleged errors in the adjudicatory processes. Dispositional orders are regarded as final and appealable as of right (*In re Faith B.*, 216 Ill. 2d 1, 3 (2005)), and appealing a dispositional order is the proper vehicle for challenging an adjudicatory finding of abuse or neglect. See, *e.g.*, *In re Arthur H.*, 212 Ill. 2d 441 (2004). That is what happened in *In re T.C.*, 2021 IL App (2d) 200691, where the respondent appealed from the dispositional order and so was able to challenge the trial court's adjudicatory finding of neglect through a direct appeal. *Id.* ¶¶ 13, 20-22. That simply did not happen here, which makes *In re T.C.* distinguishable.

¶ 24    What did happen here is that the time to complain of alleged errors in the neglect proceedings passed long before Megan filed her notice of appeal, as she failed to file a notice of appeal within 30 days of the November 15, 2019, dispositional order. See *In re Leona W.*, 228 Ill. 2d 439, 455-57 (2008) (in an appeal from a judgment terminating parental rights, the appellate court lacked jurisdiction to consider alleged errors in the adjudicatory and dispositional processes); accord *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 38; *In re S.P.* 2019 IL App (3d) 180476, ¶ 47; *In re M.J.*, 314 Ill. App. 3d 649, 654-55 (2000); *In re C.S.*, 294 Ill. App. 3d 780, 785-86 (1998). Even where a respondent alleges that she received ineffective assistance of counsel during the adjudicatory phase of the proceedings, we categorically lack jurisdiction to entertain such an argument in an appeal from an order terminating parental rights. See, *e.g.*, *In re J.J.*, 316 Ill. App. 3d 817, 825-26 (2000); *In re S.D.*, 213 Ill. App. 3d 284, 289 (1991).[1]

¶ 25    We have recited this same rule, citing much of the same authority, to Megan's appellate counsel in two prior unrelated cases (see *In re A.L.*, 2019 IL App (2d) 190600-U; *In re A.L.*, No. 2-21-0140 (2021) (unpublished summary order under Illinois Supreme Court Rule 23(c)(2)))—with the second decision coming three full weeks before counsel submitted his brief in this case. We trust that a fourth recitation of the rule will not be necessary.

¶ 26                                III. CONCLUSION

¶ 27    While "[a] notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal," along with any orders that constitute steps in the procedural progression toward such judgments (*In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶¶ 55, 59), it is clear that adjudicatory and dispositional orders are not within the procedural progression of orders terminating parental rights. Accordingly, without jurisdiction, " 'the only function remaining to the court is that of announcing the fact and dismissing the cause.' " *Houghtaylen v. Russell D. Houghtaylen By-Pass Trust*, 2017 IL App (2d) 170195, ¶ 16 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). This disposition has been filed within 150-day deadline pursuant to Illinois

---

[1]The only possible exception to this rule is a claim that the trial court failed to obtain personal jurisdiction over a defaulted parent due to improper service, as such a claim may be raised at any time, directly or collaterally. See, *e.g.*, *In re Dar. C.*, 2011 IL 111083, ¶ 60 (raising defective service claim from adjudication in a collateral challenge to termination order under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008))). That claim, however, was not raised here.

Supreme Court Rule 311(a)(5) (eff. July 1, 2018), and this appeal is hereby dismissed.

¶ 28    Appeal dismissed.