NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250619-U

NOS. 4-25-0619, 4-25-0620 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.M. and H.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 22JA190 |
| v. | ) | 22JA191 |
| Peggy H., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The appellate court lacked jurisdiction to consider respondent's claim involving ineffective assistance of counsel during the adjudication of neglect of her children and (2) the trial court's fitness and best-interest determinations were not against the manifest weight of the evidence.

¶ 2     In September 2022, the State filed petitions to adjudicate respondent Peggy H.'s minor children, T.M. (born in 2019) and H.M. (born in 2021), neglected. In January 2023, the trial court adjudicated the children neglected, found respondent unfit, made the children wards of the court, and placed guardianship and custody of the children with the Illinois Department of Children and Family Services (DCFS). At that time, respondent was represented by public defender Salena Young, who was later disciplined for simultaneously working as an assistant attorney general and as a public defender. Respondent did not appeal from the dispositional order adjudicating neglect and never raised issues in the trial concerning a conflict of interest on the

part of Young.

¶ 3 In October 2024, the State filed motions to terminate respondent's parental rights. In June 2025, the trial court granted the State's motions and terminated respondent's parental rights. The children's father, Kenneth M., is not a party to this appeal.

¶ 4 Respondent appeals, arguing (1) Young rendered ineffective assistance of counsel at the hearing to adjudicate the children neglected due to a *per se* conflict of interest and (2) the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We affirm.

¶ 5                                   I. BACKGROUND

¶ 6 In September 2022, the State filed petitions to adjudicate the children neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)), alleging that they were in an environment injurious to their welfare because of domestic violence between respondent and Kenneth. The trial court appointed Young as counsel for respondent.

¶ 7 In January 2023, respondent stipulated in each case that the State could prove the allegations in the petitions. The trial court entered a dispositional order adjudicating the children neglected, found respondent unfit, made the children wards of the court, and placed guardianship and custody of the children with DCFS. Respondent did not appeal. In August 2024, attorney Greg Sronce entered an appearance on behalf of respondent.

¶ 8 In October, 2024, the State filed motions for termination of parental rights, alleging respondent was unfit for (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the

- 2 -

children during a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2024)); and (3) failure to make reasonable progress toward the return of the children to her care during a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)). The State alleged two nine-month periods of October 25, 2023, to July 25, 2024, and January 25, 2024, to October 25, 2024.

¶ 9 In the appendix to her brief, respondent provided documents showing that, in December 2024, the Attorney Registration and Disciplinary Commission filed a complaint against Young, alleging she had a conflict of interest by simultaneously working as an assistant attorney general and as a public defender. The complaint alleged Young had represented DCFS employees on multiple occasions between November 2021 and November 2022. In March 2025, Young consented to discipline.

¶ 10 In January and April 2025, the trial court held a fitness hearing. Caseworker Jamea Scott testified she was assigned to the case from May 2022 to September 2024. Scott testified the children originally came into care due to domestic violence issues in the home. Respondent's goals included addressing (1) parenting, (2) cooperation, (3) housing, (4) income, (5) mental health, (6) substance abuse, (7) visitation, and (8) domestic violence.

¶ 11 Scott testified respondent initially made reasonable progress, was doing well, and had a period of time when she had moved to unsupervised visits with the children. However, progress stopped around six months after she gave birth in July 2023 to M.M., another child fathered by Kenneth. Also, in July 2024, respondent was arrested for shoplifting while M.M. was with her.

¶ 12 Scott testified there was a history of domestic violence between respondent and Kenneth. During the time Scott was the caseworker, Kenneth told her he was in a relationship

with respondent, but respondent would tell Scott they were not in a relationship. However, respondent admitted to being in a relationship with Kenneth in 2023. In addition, at some point after M.M. was born, respondent told Scott they were planning to become engaged.

¶ 13　　　　Although Kenneth had completed domestic violence services, in August 2024, he went to respondent's home seeking money. That led to an incident of domestic violence. Another child, A.M., who the record indicates was the children's half-sibling, was present during the incident. Kenneth was arrested due to that incident, and M.M. was taken into protective custody.

¶ 14　　　　Respondent also completed her domestic violence services. However, Scott believed respondent did not utilize the skills that were taught because respondent became engaged to Kenneth and dropped an order of protection against him.

¶ 15　　　　The last drug screen Scott had from respondent tested positive for methamphetamine and amphetamine. Respondent provided the medications she took, alleging it was a false positive, but the medications provided were not ones that would cause a false positive.

¶ 16　　　　Respondent completed parenting classes twice, but Scott had concerns because respondent gave the children apple juice knowing it hurt their stomachs and would sometimes fail to feed them during visits. Scott also testified about an incident in which respondent made an inappropriate and unsafe trip to the children's foster home, which resulted in the foster parents terminating the placement.

¶ 17　　　　Scott said respondent was generally compliant and communicated with her. However, respondent was unsuccessfully discharged from counseling because she was not engaging with the counselor.

¶ 18　　　　Bridget Mahan testified she was the current caseworker and was assigned to the

case beginning in October 2024. Mahan testified respondent and Kenneth were not supposed to be in contact with one another. Respondent was required to obtain an order of protection and initially did so, but it was dismissed after she failed to appear for a hearing on the matter. Respondent said she would not get an order of protection because she feared retaliation from Kenneth. In January 2025, Mahan saw respondent's vehicle in Kenneth's driveway and took photos of it.

¶ 19 In December 2024, respondent tested positive for methamphetamine. However, she had 25 other tests that did not reveal drug use.

¶ 20 As of the date of the April 2025 hearing, respondent had not signed a mental health release. Respondent's housing was appropriate, and she had sporadic employment. Often, respondent would not communicate with Mahan and instead would refuse to answer questions or tell Mahan to speak with her lawyer. Mahan stated respondent was combative with her and refused to engage.

¶ 21 Mahan testified about an incident during a visit with the children in which respondent upset H.M. by crying and telling her she did not like H.M.'s haircut.

¶ 22 Katelyn Hoban testified she worked as a case aide on the matter. Hoban testified she witnessed respondent exit Kenneth's home in Chestnut, Illinois, in May 2024 during a supervised visit. Respondent said she stopped there to use the restroom on her way to a store in Decatur, Illinois. The record indicates respondent lived in Springfield, Illinois, at that time.

¶ 23 Respondent testified she was no longer in a relationship with Kenneth. Respondent told the trial court she ended her relationship with Kenneth in November or December 2023. Respondent admitted she had an order of protection against Kenneth in another county in December 2022 that she had asked the court to vacate.

¶ 24        Respondent testified she knew she was required to obtain an order of protection against Kenneth after the 2024 incident. She said she sought an order of protection following the incident but stated she thought it had been denied. The State then provided evidence respondent withdrew the request for the order of protection on the same day it was entered.

¶ 25        When asked about the November 2024 order of protection, respondent said she was not sure if she withdrew that one. The State then presented evidence she failed to appear at the hearing on the matter. Respondent said she thought she had a visit with one of the children that day. She did not think she had any current orders of protection against Kenneth.

¶ 26        Respondent denied going to Kenneth's home in January 2025. She said her last contact with Kennth was during the August 2024 incident. She testified she did not follow through on the previous orders of protection because Kenneth "hadn't been around," so she thought they were unnecessary. She also feared that filing them would bring him back into her life. Respondent said her father was providing positive support for her and encouraged her to stay away from Kenneth. She said she had no intention of maintaining a relationship with Kenneth.

¶ 27        Respondent testified she was engaged in counseling and employed. She said she completed parenting and domestic violence classes. She denied using drugs and believed the positive tests were incorrect.

¶ 28        Kenneth testified his relationship with respondent ended in August 2024. He testified respondent did not visit him at his home in January 2025. Instead, he said the vehicle spotted there belonged to respondent's father, who had brought it there to have Kenneth fix the brakes. However, he admitted he had been punched in the face by respondent's father in August 2024. He also testified he was not aware of respondent using drugs.

¶ 29 The trial court found that the State proved respondent unfit by clear and convincing evidence based on respondent's (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children during a nine-month period after the adjudication of neglect; and (3) failure to make reasonable progress toward the return of the children to her care during a nine-month period after the adjudication of neglect.

¶ 30 The trial court noted that, although respondent said she ended her relationship with Kenneth in late 2023, she was seen at Kenneth's home in May 2024 and had said she stopped there to use the restroom. The court took judicial notice of the locations of Springfield, Chestnut, and Decatur and stated that Chestnut was not on the path between Springfield and Decatur. The court noted respondent also stopped engaging in counseling and had tested positive for drugs in July and December 2024. However, the court also stated it was not holding the positive drug tests against respondent because DCFS did not require respondent to obtain treatment.

¶ 31 The trial court further noted, when the August 2024 domestic violence incident occurred, Kenneth had a key to respondent's home, which had never had the locks changed. Then, respondent failed to obtain orders of protection, and her vehicle was seen at Kenneth's home in January 2025. The court found respondent's explanation that her father took the vehicle there was "wholly incredible." The court also found respondent's and Kenneth's testimony lacked credibility overall.

¶ 32 On June 12, 2025, the trial court held the best-interest hearing. Mahan testified the children had been placed in the same traditional foster home for 11 months. M.M. was also

placed in the same home. The children engaged in online calls and occasional visits with A.M.

¶ 33    Mahan testified the children were bonded to their foster parents. They called their foster parents "mom" and "dad" or "second mom" and "second dad." The foster parents provided for the children's educational, medical, emotional, and other needs, and they had signed a permanency commitment to adopt the children. Because of respondent's history of domestic violence and drug abuse, Mahan believed it was in the best interest of the children to terminate respondent's parental rights.

¶ 34    On cross-examination, Mahan stated she believed the children were also bonded to respondent. She testified about concerns that arose at the last visit she observed between respondent and the children, but she admitted the children were usually happy to see respondent and sad when respondent left. Mahan testified the foster parents were willing to continue to send respondent pictures of the children if they were adopted, but she did not know what, if any, contact they would be willing to engage in beyond that. Respondent did not testify or provide any evidence.

¶ 35    The trial court found the State proved by a preponderance of the evidence it was in the best interest of the children to terminate respondent's parental rights. The court addressed the required statutory best-interest factors, finding they supported termination of parental rights. The court noted the children needed permanence, they were well cared for, and their placement provided them with security. The court noted the possibility of difficulties for the children if M.M. was later returned to respondent's care and that it was ideal to keep siblings together, but ultimately, the court found it was inappropriate to wait to see the outcome of M.M.'s case. In doing so, the court expressed concern respondent would keep having children so that she could argue the siblings should be together and draw out the process of establishing permanency. Thus,

on June 12, 2025, the court terminated respondent's parental rights and set the permanency goal for the children to adoption.

¶ 36 This appeal followed. Respondent's notice of appeal identified only the June 12, 2025, order as the subject of the appeal.

¶ 37 II. ANALYSIS

¶ 38 On appeal, respondent argues (1) Young rendered ineffective assistance of counsel at the hearing to adjudicate the children neglected due to a *per se* conflict of interest and (2) the trial court's fitness and best-interest determinations were against the manifest weight of the evidence.

¶ 39 A. Conflict of Interest

¶ 40 Respondent first contends we should reverse because Young rendered ineffective assistance of counsel during the adjudication of neglect proceedings when she labored under a *per se* conflict of interest by working simultaneously for both the State and the public defender's office. The State argues (1) this court lacks jurisdiction to decide the issue, (2) respondent forfeited the issue, and (3) the issue lacks merit. We agree we lack jurisdiction to decide the issue.

¶ 41 Illinois Supreme Court Rule 660(a), (b) (eff. Oct. 1, 2001) provides that, except in cases of juvenile delinquency, appeals from final judgments under the Juvenile Court Act are governed by the rules applicable to civil cases. *In re Janira T.*, 368 Ill. App. 3d 883, 891 (2006). To properly perfect an appeal in a civil case, the notice of appeal must be filed within 30 days after entry of the final order unless an extension of the 30-day time limit is granted under Illinois Supreme Court Rule 303(d) (eff. July 1, 2007). *Janira T.*, 368 Ill. App. 3d at 891.

¶ 42 Dispositional orders adjudicating findings of abuse or neglect are final and

appealable as of right. *In re Ja. P.*, 2021 IL App (2d) 210257, ¶ 23. Thus, appealing from the dispositional order finding abuse or neglect is the proper vehicle for challenging that finding. *Ja. P.*, 2021 IL App (2d) 210257, ¶ 23. When a respondent fails to appeal from the dispositional order adjudicating neglect within 30 days of its entry, this court lacks jurisdiction to review that order. *Ja. P.*, 2021 IL App (2d) 210257, ¶ 24; *In re S.B.*, 2023 IL App (4th) 220629-U, ¶ 68. "Even where a respondent alleges that she received ineffective assistance of counsel during the adjudicatory phase of the proceedings, we categorically lack jurisdiction to entertain such an argument in an appeal from an order terminating parental rights." *Ja. P.*, 2021 IL App (2d) 210257, ¶ 24.

¶ 43        Here, we are without jurisdiction to entertain respondent's claim, as she did not file a timely notice of appeal from the judgment adjudicating the children neglected and making the children wards of the court. See *In re Leona W.*, 228 Ill. 2d 439, 456-57 (2008); *In re L.J.*, 2024 IL App (4th) 240750-U¸ ¶ 39. Respondent argues she was unable to learn of counsel's conflict of interest within the allowable time to appeal. However, even if we were able to make an exception based on discovery of the issue, we would still be without jurisdiction because respondent's notice of appeal did not identify the dispositional order, and a dispositional order is not within the procedural progression of orders terminating parental rights. *L.J.*, 2024 IL App (4th) 240750-U¸ ¶ 39; see Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017) (providing the notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court"); *Ja. P.*, 2021 IL App (2d) 210257, ¶ 27 ("[I]t is clear that adjudicatory and dispositional orders are not within the procedural progression of orders terminating parental rights.").

¶ 44        Further, even if we were able to exercise jurisdiction, we would also agree

respondent forfeited the issue. An issue that was not objected to during trial and raised in a posttrial motion is forfeited on appeal. *In re J.C.*, 2024 IL App (4th) 240747, ¶ 29. " 'It is well established that, to preserve an alleged error for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it.' " *J.C.*, 2024 IL App (4th) 240747, ¶ 29 (quoting *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011)). Here, respondent never raised the issue of Young's conflict of interest in the trial court, despite the entry of appearance of new counsel in August 2024 and the commencement of disciplinary action against Young in December 2024.

¶ 45                              B. Fitness Determination

¶ 46        Respondent next argues the trial court erred in finding the State proved her unfit by clear and convincing evidence.

¶ 47        Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 48        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *N.G.*,

- 11 -

2018 IL 121939, ¶ 29. "As the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003).

¶ 49 One of the grounds the trial court found for unfitness was that respondent failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2024). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). This court has explained reasonable progress exists when a trial court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). " 'Reasonable progress' is measured by an objective standard." *In re A.R.*, 2023 IL App (1st) 220700, ¶ 70.

¶ 50 Here, there was sufficient evidence respondent failed to make reasonable progress toward reunification during the nine-month periods at issue. Although respondent had previously done well, she later failed to engage in services. Then, despite the history of domestic violence between respondent and Kenneth, respondent continued to see him. The trial court specifically found respondent's testimony lacked credibility. The court then reasonably found respondent was at Kenneth's home in May 2024, and a serious incident of domestic violence between respondent and Kenneth occurred in August 2024. When that incident occurred, Kenneth had a key to respondent's home, which had never had the locks changed. Following the incident, respondent refused to obtain orders of protection. Then, her vehicle was seen at Kenneth's home in January 2025, providing evidence she was not truthful when she told the court she had ended her relationship with Kenneth in late 2023. Instead, the evidence showed she continued to see

Kenneth during the time periods at issue.

¶ 51 Given respondent's lack of progress and evidence she continued to see Kenneth during the time periods at issue, the State showed respondent could not progress to a return of the children in the near future. Accordingly, the trial court's determination respondent failed to make reasonable progress toward the return of the children was not against the manifest weight of the evidence.

¶ 52 C. Best-Interest Determination

¶ 53 Respondent next contends the trial court's best-interest determination was in error.

¶ 54 When a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366.

¶ 55 In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's

need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 56        Here, the trial court specifically referenced the statutory best-interest factors and found they weighed in favor of terminating respondent's parental rights. The evidence demonstrated the children had strong bonds with their foster parents and with M.M., who was placed in the same foster home. The children needed permanence, and the foster parents provided for the children's needs and provided safety and security.

¶ 57        The trial court recognized the possibility of difficulties for the children if M.M. was later returned to respondent's care and that it was ideal to keep siblings together, but ultimately, the court found it was inappropriate to wait to see the outcome of M.M.'s case. Respondent argues the court made inappropriate comments expressing concern that she would keep having children to draw out the process of establishing permanency so that she could argue the siblings should be together. However, those speculative comments of the court aside, the evidence overall supported the court's finding. Here, the evidence in the record does not clearly call for the opposite finding, such that no reasonable person could find as the trial court found.

See *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best-interest determination was not against the manifest weight of the evidence.

¶ 58                                    III. CONCLUSION

¶ 59          For the reasons stated, we affirm the trial court's judgment.

¶ 60          Affirmed.