NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251097-U

NO. 4-25-1097

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 20, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* P.D., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
|     Petitioner-Appellee, | ) | No. 21JA121 |
|     v. | ) | |
| Jason H., | ) | Honorable |
|     Respondent-Appellant). | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed the termination of respondent father's parental rights, finding no arguably meritorious arguments could be raised on appeal.

¶ 2    On October 10, 2025, the trial court found respondent, Jason H., an unfit parent and terminated his parental rights with respect to his minor child, P.D. (born in March 2015). Respondent appealed the court's decision, and counsel was appointed to represent him. Counsel later filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), concluding that the appeal presented no viable grounds for relief. Respondent was notified of counsel's request to withdraw and did not file a response.

¶ 3    We grant counsel's motion to withdraw and affirm the judgment of the trial court.

¶ 4    I. BACKGROUND

¶ 5    On December 6, 2021, the State filed a petition for adjudication of wardship

alleging that P.D. was neglected and abused due to being in an environment that was injurious to his welfare and where he was at risk of sexual abuse See 705 ILCS 405/2-3(1)(b) (West 2020). The petition alleged that, on November 7, 2021, the Illinois Department of Children and Family Services (DCFS) received a report alleging sexual abuse by respondent relating to P.D.; his sister, J.H.; and the children of respondent's former paramour, Krystal G. On November 8, 2021, DCFS implemented a safety plan to keep the children out of the home and with a relative until they could be interviewed by the Rock Island Children's Advocacy Center (CAC). However, on November 24, 2021, respondent stated he would not give permission for his children to be transported for the CAC interviews and removed them from the relative's home. Respondent informed a DCFS investigator that he and the children had relocated to Iowa but would not disclose a location. At the same time, Krystal's children completed their CAC interviews. Two children confirmed that respondent had sexually touched or penetrated them, and a third child disclosed witnessing the touching.

¶ 6        The petition further alleged that, on December 2, 2021, respondent was arrested and charged with unlawful possession with the intent to deliver methamphetamine and possession of drug paraphernalia in Rock Island County case No. 21-CF-1023. The whereabouts of P.D.'s mother, Christina D., were unknown at the time of the petition.

¶ 7        On December 7, 2021, pursuant to a petition filed by the State, temporary custody of P.D. was given to DCFS. The trial court found probable cause that P.D. was neglected and abused as alleged in the petition and found there existed an urgent and immediate necessity to remove him from the home because remaining there was contrary to his welfare, safety, and best interest due to respondent's incarceration in the Rock Island County jail.

¶ 8        On March 17, 2022, the trial court held a pretrial conference, at which Christina

stated her intent to stipulate to the allegations in the petition. Respondent appeared at the hearing with his attorney. The court informed Christina of her rights and informed her that by stipulating to the petition, she agreed that the State would be able to prove the petition's allegations. Christina confirmed that she understood. The court then addressed respondent, asking if he also understood that if P.D. was made a ward of the court, he would be required to work to correct the conditions which led to his removal and, if he failed to do so, his parental rights could be terminated. Respondent confirmed his understanding. After verifying that no one had threatened Christina into stipulating to the petition, the court found the stipulation was knowingly given. It then asked the State to provide a factual basis supporting the stipulation, to which the State responded, "As alleged in the petition, Your Honor." The court took judicial notice of the petition and found a factual basis existed to support Christina's stipulation.

¶ 9        On April 29, 2022, the trial court held a dispositional hearing for P.D. Counsel for respondent objected to the State's recommendation that respondent receive mental health treatment, arguing that there were no allegations made against respondent to support such a recommendation. The court noted that Christina had stipulated to the facts of the petition, which detailed a report of sexual abuse against respondent and would justify the recommended service. The following exchange took place between the court, respondent's counsel, and the State:

> "THE COURT: Are you contesting my adjudicating the minors neglected today?
>
> [COUNSEL FOR RESPONDENT]: Yes.
>
> THE COURT: So you want a hearing on this?
>
> [COUNSEL FOR RESPONDENT]: Yes.
>
>         ***

THE COURT: All right. \*\*\* We're going to have to set this for merits.

[THE STATE]: We already have a stipulation, Your Honor.

THE COURT: For the mother. But he's objecting to it.

[THE STATE]: The Court accepted the disposition.

THE COURT: I did accept the disposition.

You know what, [counsel], I think the State's right. \*\*\* There's been a stipulation. I'm going to go ahead and adjudicate the minors neglected. I'm finding that it's in their best interest that they be made wards of the Court. I'm finding that the parents are unfit to care for the children at this time and that the health, safety, welfare, and best interests of the children would be jeopardized if the children were to remain in the custody of the parents.

Guardianship is granted to DCFS with all the attendant rights and responsibilities thereof."

The court informed respondent that he had the right to appeal the court's decision. It subsequently entered a written order adjudicating P.D. neglected and abused and making him a ward of the court. It also found both parents unfit, noting that Christina's "whereabouts had been unknown prior to the case opening and she reside[d] out of state." For respondent's unfitness, the court wrote, "[A]s alleged in the Petition."

¶ 10    In a supplemental order, respondent was ordered to cooperate with DCFS, successfully complete parenting classes, obtain a substance abuse evaluation and follow all recommendations for treatment, obtain a psychiatric evaluation and follow all recommendations for treatment, obtain appropriate housing and income, obtain a sex offender risk assessment and follow all recommendations for treatment, and obtain a domestic violence assessment and follow

all recommendations for treatment. The order further provided that visitation between respondent and P.D. was to be at the discretion of DCFS.

¶ 11　　On May 11, 2022, respondent filed a motion to reconsider the adjudicatory and dispositional orders. In his motion, he alleged that he was not present at the time Christina made a stipulation of facts sufficient to support a finding that P.D. was neglected and abused. He asserted that it would be a denial of due process for Christina, who had not been present P.D.'s life for years, to stipulate to the events that occurred in his home. From the record on appeal, it is unclear if any action was taken on this motion.

¶ 12　　On October 22, 2024, the State filed a supplemental petition to terminate respondent's parental rights. The petition alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to P.D. See 750 ILCS 50/1(D)(b) (West 2024). The petition also alleged that respondent had failed to make reasonable efforts to correct the conditions that were the basis for the removal of P.D. during any nine-month period following the adjudication of neglect, specifically, the periods of April 30, 2023, through January 30, 2023, January 31, 2023, through October 31, 2023, and November 1, 2023, to August 1, 2024. See 750 ILCS 50/1(D)(m)(i) (West 2024). It further alleged that he had failed to make reasonable progress toward the return of P.D. during the same nine-month periods. See *id.* § 50/1(D)(m)(ii). The petition therefore concluded that it was in the best interest of the minor that respondent's parental rights be terminated.

¶ 13　　On October 2, 2025, the trial court held a hearing on respondent's fitness. While the court discussed preliminary matters, respondent's counsel interrupted to inform the court that respondent, who was present at the hearing, no longer wished to attend. Counsel asked the court to admonish him. The court addressed respondent directly, reminding him that he had requested

the hearing. Respondent replied, "Yeah, I know. I don't want to be here. I just want to go before I snap. I want to do that." When the court cautioned respondent that he would be giving up certain rights by not being present, respondent stated, "I don't care. I'll sign all the rights over. I don't care. Do what you're going to do, because it's going to happen regardless. I'm ready to go." After confirming that he was willingly waiving his right to be present at the hearing, the court allowed him to leave.

¶ 14    Kimberly Lehmkuhl, a retired caseworker, testified for the State. She stated that she worked on P.D.'s case from January 2023 until her retirement in October 2024. At the time she was assigned the case, respondent had already been assessed for services and was required to complete a mental health evaluation and counseling, a domestic abuse evaluation and counseling, parenting classes, a substance abuse evaluation and counseling, and a sex offender assessment. He was also required to obtain stable housing and income. She stated that in November 2023, respondent did not have housing that she could assess for appropriateness and he had told other workers that he was homeless. When she tried to address this issue with him, she was unable to reach him by phone. However, in December 2023, he and his mother arrived at Lehmkuhl's workplace and "demand[ed] a meeting." At that time, he claimed to be living in his mother's trailer in Iowa. Lehmkuhl stated that she did not feel comfortable going to that home for an assessment because respondent behaved aggressively at the meeting, including pounding on the table, calling Lehmkuhl and her supervisor names, suggesting they were not doing their job, and blaming them for the loss of his children. According to Lehmkuhl, her supervisor ended this meeting early due to respondent's verbally abusive behavior.

¶ 15    Lehmkuhl testified that respondent was referred for mental health services and was assessed to receive further mental health treatment. He also was set up to complete a substance

abuse program with the same treatment center where he would receive mental health services. However, she was notified in March 2024 that he had been unsuccessfully discharged by the center because he did not follow their recommendations. He did not reengage with either mental health treatment or substance abuse treatment following his discharge.

¶ 16       Lehmkuhl testified that respondent did not complete domestic violence services during her assignment to the case. He also failed to complete a sex offender assessment after scheduling an appointment in April 2024 and not showing up.

¶ 17       Respondent visited with P.D. one time in February 2023. However, according to Lekmkuhl, around that time, "an allegation was made" by P.D., and it was recommended that visits be suspended until respondent completed the sex offender assessment. Because respondent never completed this assessment, visits were never reinstated. Lehmkuhl explained the yearlong delay between respondent's visits being suspended and his sex offender assessment being scheduled, stating that respondent continuously refused to complete the assessment until early 2024. At that time, an appointment was scheduled that he would later miss. Lehmkuhl stated that at no point was she able to recommend unsupervised visits between respondent and his children.

¶ 18       Lehmkuhl acknowledged that respondent had successfully completed parenting classes prior to her management of the case. Additionally, he provided proof of his income in early 2024, after being asked to do since the case's inception.

¶ 19       After hearing arguments from the parties, the trial court announced its decision. It noted that respondent was ordered in 2022 to comply with directives in his case plan and it had taken him over a year to complete parenting classes and provide proof of income. Additionally, he had failed to complete nearly every other aspect of his service plan. He never graduated to unsupervised visitation with P.D., never completed his mental health treatment, did not follow

through with substance abuse treatment, and did not complete a domestic violence program. His residence in Iowa was unable to be assessed because respondent's behavior made the caseworker feel unsafe to go there. Further, he did not complete a sex offender assessment, which the court noted was "the entire reason why [P.D.] came into care to begin with." The court noted that respondent, at every juncture of the case, "stalled and malingered." It concluded that the State had proven by clear and convincing evidence that respondent was unfit for (1) failing to make reasonable efforts to return the minors to his care during the period from November 1, 2023, to August 1, 2024, and (2) failing to make reasonable progress toward the return of the child to his care during the same nine-month period.

¶ 20         A best-interest hearing was held for P.D. on October 10, 2025. Counsel for respondent again informed the trial court that respondent wanted to be excused from the proceedings. The court again admonished respondent of the rights he would be giving up if he did so. Respondent confirmed his understanding, and the court allowed him to leave.

¶ 21         The State rested on a best-interest report prepared for the hearing by the Center for Youth and Family Solutions. The report stated that P.D. had been living with his paternal uncle and his wife for 22 months. P.D. was strongly bonded to his caregivers, and they were committed to adopting him. His basic health, safety, and developmental needs were being met, including his mental health needs. His foster parents ensured that P.D. continued with counseling, monitored his academic progress, and kept him active in school activities and sports. They also maintained a connection between P.D. and J.H., who was with a separate caregiver, by organizing weekend visits and sleepovers between the two.

¶ 22         The report further noted that respondent was offered weekly visits with P.D. when the case opened and had sporadic engagement during these scheduled visits. While visiting with

P.D., respondent frequently spent time arguing with caseworkers and other staff about different aspects of the case.

¶ 23　　　The report concluded that P.D.'s foster parents had consistently met his needs, while respondent failed to do so. It recommended that respondent's parental rights be terminated.

¶ 24　　　The trial court began its ruling by noting that P.D.'s case had been open for approximately four years and, during that time, respondent had failed to make progress toward reunification. It found that P.D.'s identity had developed while in the care of his foster parents and his ties to his background were strengthened by his placement with relatives who encouraged him to maintain contact with his sibling. Additionally, his current placement offered P.D. an opportunity for permanence. The court therefore concluded that it was in P.D.'s best interest to terminate respondent's parental rights. A written order was entered the same day.

¶ 25　　　This appeal followed.

¶ 26　　　　　　　　　　　　　II. ANALYSIS

¶ 27　　　Respondent challenges the trial court's unfitness and best-interest findings only with respect to his son, P.D. Counsel on appeal moves to withdraw, stating that any challenge to these findings would be without merit.

¶ 28　　　When, after examining the record, counsel finds a case to be wholly frivolous, she must advise the court of this fact and request permission to withdraw. *Anders*, 386 U.S. at 744. Her request must be accompanied by a brief that sets out "any irregularities in the trial process or other potential errors" that might be "arguably meritorious" in the judgment of the client, another attorney, or the court, even if counsel herself believes they are not a basis for relief. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). She must sketch the arguments for these issues and explain why she believes they are frivolous. *Id.* When seeking to withdraw from a case involving findings of

parental unfitness and termination of parental rights, counsel must review both the finding of unfitness and the best-interest determination for potential error. *Id.* If, after examining the proceedings and counsel's arguments, we agree that the case is frivolous, we may grant counsel's motion to withdraw. *Anders*, 386 U.S. at 744.

¶ 29 Counsel here states that she has reviewed the proceedings from both the unfitness hearing and the best-interest hearing and determined that no argument can be made that the trial court erred in terminating respondent's parental rights with respect to P.D. We agree and will discuss each issue in turn.

¶ 30 A. Unfitness Finding

¶ 31 The Juvenile Court Act of 1987 creates a two-step process by which parental rights may be involuntarily terminated. *In re M.I.*, 2016 IL 120232, ¶ 20; 705 ILCS 405/2-29(2) (West 2024). First, the court must find by clear and convincing evidence that a parent is "unfit" as the term is defined in the Adoption Act. *M.I.*, 2016 IL 120232, ¶ 20; see 750 ILCS 50/1(D) (West 2024). Following an unfitness finding, the court must then determine if it is in the best interest of the child to terminate the parent's rights. *M.I.*, 2016 IL 120232, ¶ 20.

¶ 32 A parent is unfit where he fails to make reasonable progress toward the return of his child during any nine-month period following an adjudication of abuse or neglect. 750 ILCS 50/1(D)(m)(i) (West 2024). When assessing reasonable progress, the court takes "an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps." *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 53. Reasonable progress exists where a trial court can conclude that a child could be returned to the parent in the near future. *Id.* Additionally, a failure to make reasonable progress is shown where a parent fails to substantially fulfill the obligations of his service plan and correct the conditions that

brought the child into care. 750 ILCS 50/1(D)(m)(ii) (West 2024). We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 33        Here, the trial court found that respondent was unfit for failing to make reasonable progress toward the return of P.D. during the period from November 1, 2023, through August 1, 2024. This finding was well supported by the evidence presented at the fitness hearing. Lehmkuhl testified that respondent failed to complete the vast majority of his required services. He did not complete mental health treatment, substance abuse treatment, domestic violence classes, or a sexual offender assessment. Throughout the case, he was resistant to assistance from caseworkers and aggressive in his interactions with them. His visitation with P.D. was initially sporadic and later nonexistent, and he did not take the necessary steps to reinstate it. Lehmkuhl testified that at no point could she have recommended respondent have unsupervised visits with P.D. Even in areas in which he cooperated with his service plan, such as parenting classes and conveying information about his income, progress was only accomplished after significant delay. As the trial court stated, at every point of this case, respondent "stalled and malingered." It is clear that at no time in the relevant nine-month period could the court have ordered P.D. imminently returned to respondent's care.

¶ 34        Although the State raised multiple grounds of unfitness, a parent may be found unfit if even a single alleged ground of unfitness is supported by clear and convincing evidence. *Id.* ¶ 51. Because the evidence presented here established that respondent was unfit for failing to make reasonable progress during the period from November 1, 2023, through August 1, 2024, we agree with counsel that no nonfrivolous argument may be raised that the trial court's finding of unfitness

was against the manifest weight of the evidence.

¶ 35                                    B. Best-Interest Finding

¶ 36         After finding a parent unfit, the court must determine if it is in the best interest of the minor to terminate parental rights. When making a best-interest determination, the following factors must be considered within the context of the child's age and developmental needs:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for

- 12 -

stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

While all the factors must be considered, no single factor is dispositive. See *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 31. We will not reverse a trial court's best-interest determination unless it is against the manifest weight of the evidence. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35.

¶ 37         Here, the report presented at the best-interest hearing established that P.D. was well cared for in his foster placement and bonded with his foster parents. They were also bonded to him and intended to adopt him, which would grant P.D. stability and permanence. His foster placement also supported P.D.'s connection to his background and family ties, as he was placed with his paternal uncle and aunt, and they facilitated regular visits between P.D. and his biological sister. Based on this information, it is clear that P.D.'s foster placement provided him physical safety, love, security, permanence, and a connection with his background and family. In contrast to this stability and permanence, it was uncertain when or if P.D. could ever be returned to respondent's care. See *In re J.B.*, 2019 IL App (4th) 190537, ¶ 35 (finding it was not in the children's best interest to continue the parental rights of a father who had failed to engage in services because "doing so would be forcing them to perpetually wonder if [the father] would suddenly reappear and attempt to be a part of their lives"). It was therefore not against the manifest weight of the evidence for the trial court to conclude that it was in P.D.'s best interest to terminate respondent's

parental rights. We agree with counsel that any argument to the contrary would be frivolous.

¶ 38                                   C. Other Potential Arguments

¶ 39            Our review of the record reveals no other potentially meritorious arguments. Although respondent filed a motion contending that his due process rights were violated by the trial court's acceptance of Christina's stipulation to the allegations in the petition for adjudication of neglect, and it is unclear if this issue was ever heard, respondent did not appeal this issue within 30 days of the order adjudicating his children neglected and making them wards of the court. See *In re T.M.*, 2025 IL App (4th) 250619-U, ¶ 42 ("When a respondent fails to appeal from the dispositional order adjudicating neglect within 30 days of its entry, this court lacks jurisdiction to review that order."); see also *In re Ja. P.*, 2021 IL App (2d) 210257, ¶ 23 (noting that an appeal from a dispositional order was "the proper vehicle for challenging an adjudicatory finding of abuse or neglect"). Therefore, even if there were potential merit to the argument, we would lack jurisdiction to review it.

¶ 40                                   III. CONCLUSION

¶ 41            For the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 42            Affirmed.